[No. 14592. In Bank.—April 17, 1896.]

## LEONIDE H. BURLING ET AL., APPELLANTS, v. FRANK G. NEWLANDS ET AL., RESPONDENTS.

TRUST FOR BENEFIT OF CREDITORS—BROKERS AS CREDITORS—PAYMENT INDUCED BY FRAUD OF TRUSTEE—ASSIGNMENT OF CLAIMS—ENFORCEMENT OF TRUST.—Where a firm of brokers was employed by a banker to negotiate loans for his benefit, which they negotiated in their own names, and gave their notes therefor, at his request, receiving as security collaterals furnished by him, and assuming that an express trust was created by him for the benefit of his creditors, such brokers are his creditors to the amount of their advances, and would be beneficiaries of such trust, and entitled to enforce the same, and they may enforce, as a claim against the trust estate, the amount of a payment made to the trustee, upon his agreement to assume payment of their notes, the payment made by them having been induced by false and fraudulent representations made by the trustee as to the insolvency of the trust estate, and as to fraud committed by the trustor in respect of the collateral securities given by him to them; nor is their right to enforce the claim for such payment lost by reason of an assignment of their claims to the trustee, induced by the same fraudulent representations; but they have a right to repudiate such assignment, and to treat the payment made by them as having been an advance made upon their notes, and the fact that the notes had been previously paid by the trustee, without their knowledge, and that the money paid by them was used by him for other purposes, would not affect the liability of the trust fund to reimburse such payment.

ID.—PARTICIPATION OF CREDITORS IN FRAUD—SURRENDER OF COLLATERALS—GOOD FAITH—RIGHT TO EQUITABLE RELIEF.—The brokers, as creditors, are not to be deprived of equitable relief, on the ground that they were participators in a fraud upon the trust estate, by reason of assigning their claim to the trustee for the whole amount of the money borrowed by them, and surrendering to him the collaterals in their possession pledged as security therefor, where it was their understanding that the notes were to be paid in full, and not discounted, and that the collaterals would go to the benefit of the trust fund, and that the trust estate was insolvent, so that the trustee, after receiving an assignment in full of their claims, besides the cash paid by them to him, would obtain a dividend of less than the amount of his advances to pay the notes, and that other creditors would not suffer prejudice in the dividend.

ID.—RESCISSION OF ASSIGNMENT—RESTITUTION.—The brokers were not required to make any restitution to the trustee or to his representatives, as a condition of rescinding the assignment and enforcing a trust for the amount of money paid to the trustee, where it appears that he was merely discharging his duty as a trustee in paying their notes, and that the notes were, in fact, all settled and paid before he received the payment obtained from the brokers.

ID.—INSUFFICIENT TRUST FOR CREDITORS—BENEFIT OF TRUSTOR AND TRUSTEES—INCIDENTAL PAYMENT OF DEBTS.—A trust conveyance which ex-

pressly declares only a trust for the joint and several interests of the trustor and trustee, and does not allude in terms to any creditors of the trustor, cannot be construed as a trust for the benefit of his creditors in such a sense as to make them beneficiaries of the trust, or to confer upon them any vested interest in the trust estate, or to charge it with the payment of their claim, either in full or *pro rata*, although the pay-·ment of the debts of the trustor may be incidental to the execution of the trust, in order to prevent his creditors from assailing it; and under such a conveyance the trustee may deal with. any of the creditors of the trustor at arm's length, and is not charged with any duty as to them.

Id.—Express Trust in Writing—Declarations of Trustee—Increase of Beneficiaries—Accounting of Trust Estate.—The declarations of the trustee cannot add to the terms of an express trust created by an instrument in writing, or vest an interest in the trust estate in other beneficiaries of his own selection, who were not selected by the trustor as beneficiaries, nor can the creditors of the trustor, for whom he declared no trust, demand an accounting from the trustee or his representatives, upon the ground that the trustee declared himself to be their trustee.

Id.—Use of Money to Pay Off Liens—Charge upon Trust Estate—Absence of Agreement—Money not Ear-marked.—The use of money obtained by a trustee from another person to clear off liens upon the trust estate cannot make such person a beneficiary of the trust, nor create a lien in favor of such third person upon the trust estate, in the absence of any agreement that it should constitute a lien thereupon, nor can such money be collected from the trust estate where it ,is not ear-marked or followed into any property in his hands, or in the hands of his successors in interest in the trust estate; but the claim for such money is a mere personal demand against the trustee, to be enforced against him or his personal representatives.

Pleading—Specification of Amendment after Demurrer Sustained—Discretion.—In the absence of a specification of what amendment could be made, or which was desired to be made, to the complaint, after a demurrer is sustained thereto, it is not an abuse of discretion for the court not to grant leave to amend.

Appeal from a judgment of the Superior Court of the City and County of San Francisco. Walter H. Levy, Judge.

The facts are stated in the opinion of the court.

*Joseph M. Nougues,* and *Charles E. Nougues,* for Appellants.

Ralston's deed to Sharon was, and operated as, an assignment for the benefit of creditors; and was contemplated to protect and provide for all subsisting liabilities·

of the assignor (Ralston) whether absolute or contingent. This was lawful for him to do, for his trustee to accept, and for his creditors to accept. (Civ. Code, sec. 3452.) Sharon's written declaration that it was a trust to pay Ralston's debts bound him and those in privity. Sharon, having accepted the trust, entered into the possession of the trust estate, and he became, and was a trustee of an express trust, whether any of the provisions of sections 3461, 3462, 3463, et seq., of the Civil Code were complied with or not; and the trust continues until repudiated to the knowledge of the *cestui que* trust. (*Baker* v. *Joseph*, 16 Cal. 173; *Ord* v. *De La Guerra*, 18 Cal. 67; *Schroeder* v. *Jahns*, 27 Cal. 274; *Wright* v. *Ross*, 36 Cal. 414; *Miles* v. *Thorne*, 38 Cal. 335; 99 Am. Dec. 384; *Hearst* v. *Pujol*, 44 Cal. 230; *Janes* v. *Throckmorton*, 57 Cal. 368; *Zuck* v. *Culp*, 59 Cal. 142; *Mitchell* v. *Beckman*, 64 Cal. 330; *McClure* v. *Colyear*, 80 Cal. 378.) The Burlings were creditors of Ralston. (Civ. Code, sec. 2847, 3429, 3430; Mechem on Agency, sec. 652; Story on Agency, sec. 336; *D'Arcy* v. *Lyle*, 5 Binn. 441; *Maitland* v. *Martin*, 86 Pa. St. 120; *Bibb* v. *Allen*, 149 U. S. 481–99; 1 American Leading Cases, 856; *Bayley* v. *Wilkins*, 7 Com. B. 886; *Smith* v. *Lindo*, 5 Com. B., N. S., 587; *Elwood* v. *Diefendorf*, 5 Barb. 398; *Van Wyck* v. *Seward*, 18 Wend. 375; *Estate of Hill*, 67 Cal. 238–43; *Dunsmoor* v. *Furstenfeldt*, 88 Cal. 529.) The liability of Ralston to the Burlings was subsisting at the time he made the deed in trust to Sharon. The amount of money the Burlings had to pay depended, under the circumstances of the case, upon the ascertainable value of the collaterals. It made no difference in regard to whom they paid, and whatever amount they paid formed a provable and enforceable debt against the trust estate in Sharon's possession. (Roberts on Fraudulent Conveyances, 459; Bump on Fraudulent Conveyances, 484; *Howe* v. *Ward*, 4 Greenl. 195; *Thompson* v. *Thompson*, 19 Me. 244; *Carlisle* v. *Rich*, 8 N. H. 44; *Ex parte Simpson*, 3 Deac. & C. 792; *Ex parte Myers*, 2 Deac. & C. 251; *French* v. *Morse*, 2 Gray, 111; *Jemison* v. *Blowers*, 5

Barb. 686; *Woodard* v. *Herbert*, 24 Me. 358.)   The payment to Sharon, the trustee, by the Burlings merely ascertained the amount of the previously existing liability on Ralston's part.   (*Bide* v. *Harrison*, L. R. 17 Eq. 76, 77; *Booth* v. *Hutchinson*, L. R. 15 Eq. 30, 33; Civ. Code, secs. 3429, 3430; *Frazer* v. *Tinus*, 1 Binn. 254–62; *New Jersey Ins. Co.* v. *Meeker*, 37 N. J. L. 282.)   The right to an accounting of the trust estate of Ralston is inherent in the Burlings as beneficiaries, and does not rest in or arise from fraud.   (*Green* v. *Brooks*, 81 Cal. 328; *Dickenson* v. *Lord Holland*, 2 Beav. 310.)   Nor does it depend upon the money paid by the Burlings having been "ear-marked," but upon the principle that Sharon, in breach of the trust, transferred all the property of the Ralston estate, without consideration, to defendants, and one of them having actual notice of the fraudulent manner in which Sharon dealt with that estate, the Burlings, the *cestuis que trust*, have the right to follow all the trust property in their hands, and obtain an accounting thereof.   (*Oliver* v. *Piatt*, 3 How. 333–412; *Prevost* v. *Gratz*, 6 Wheat. 482; Story's Equity Jurisprudence, secs. 533, 1258, 1291; *Taylor* v. *Plummer*, 3 Maule & S. 574; *Liddell* v. *Norton*, 21 Beav. 183; *Lathrop* v. *Bampton*, 31 Cal. 17; 89 Am. Dec. 141; *Scrivner* v. *Dietz*, 84 Cal. 295; *Price* v. *Reeves*, 38 Cal. 457.)   The negotiations of Sharon with the Burlings was in regard to the subject matter of the trust, and in connection with the trust, and he could not obtain any advantage therein over the latter by the slightest misrepresentation or concealment.   (Civ. Code, secs. 2228–31, 2234, 2235; *Wickersham* v. *Crittenden*, 93 Cal. 17.)   There was no release from the Burlings.   The assignment of claims or notes was not an assignment of their right as creditors, but if so, the release was void.   Sharon never individually parted with a cent.   (*Trigg* v. *Read*, 5 Humph. 529; 42 Am. Dec. 447; *Carr* v. *Callaghan*, 3 Litt. 365; *Gibbons* v. *Caunot*, 4 Ves. 840; *Walker* v. *Symonds*, 3 Swans. 1; *Gordon* v. *Gordon*, 3 Swans. 471; *Hotchkis* v. *Dickson*, 2 Bligh, 348; *Stewart* v. *Stewart*, 6 Clark & F.

911; *Harvey* v. *Cooke*, 4 Russ. 34; *Pickering* v. *Pickering*, 2 Beav. 36; Civ. Code, sec. 1542; *Wells* v. *Robinson*, 13 Cal. 133; *Taylor* v. *Plummer*, *supra*.) The court erred in refusing leave to amend the complaint.

*William F. Herrin, J. M. Allen*, and *H. L. Gear*, for Respondents.

No cause of action is stated, as there is no allegation of any agreement between the Burlings and Ralston in regard to commissions, and no allegation as to what their services were reasonably worth, or that they were unpaid for their services, or that any specified amount was due therefor. The averment of what sum is "due and owing" is a mere conclusion of law, which is not admitted by demurrer, where no facts are alleged from which the conclusion follows. (*Frisch* v. *Caler*, 21 Cal. 71; *Doyle* v. *Phœnix Ins. Co.*, 44 Cal. 264; *Roberts* v. *Treadwell*, 50 Cal. 520; *Richards* v. *Travelers' Ins. Co.*, 80 Cal. 506; *Curtiss* v. *Bachman*, 84 Cal. 216.) The payment of the $200,000 from the Burlings to Sharon could not create an indebtedness against Ralston as an individual, nor operate to raise any charge or lien upon the trust estate in the hands of Sharon, in the absence of an express agreement for a specific lien thereupon, the payment not being included in the terms of the trust deed from Ralston to Sharon. A trustee cannot create a charge or lien upon the trust estate in favor of a third person without express authority given by the terms of the trust deed. (*New* v. *Nicoll*, 73 N. Y. 127; 29 Am. Rep. 111; *L'Amoureux* v. *Van Rensselaer*, 1 Barb. Ch. 34, 37, 38; *Steele* v. *Steele*, 64 Ala. 438; 38 Am. Rep. 15; *Starr* v. *Moulton*, 97 Ill. 525; *Johnson* v. *Lemon*, 131 Ill. 609; 19 Am. St. Rep. 63; *Worrall* v. *Harford*, 8 Ves. Jr. 4, 8; *Hall* v. *Laver*, 1 Hare, 577; *Heriot's Hospital* v. *Ross*, 12 Clark & F. 507; *Francis* v. *Francis*, 5 De Gex, M. & G. 108; *Jones* v. *Dawson*, 19 Ala. 676–677; *Fearn* v. *Mayers*, 53 Miss. 458.) The mere request of Ralston for the negotiation of the loans by the Burlings is not sufficient to show the relation of suretyship between them

and him in his individual capacity. (Civ. Code, sec.
2831; Code Civ. Proc., sec. 1963, subds. 1, 15, 19, 20;
*Bean* v. *Pioneer Min. Co.*, 66 Cal. 451; 56 Am. Rep. 106.)
The assignment and the accompanying assumption by
Sharon of all liabilities of the Burlings upon their out-
standing notes and his payments thereof was an exe-
cuted contract between them and Sharon, which could
only be avoided by a direct proceeding for rescission
against Sharon or his personal representative, and must
be held valid in this proceeding. (*Hammond* v. *Wallace*,
85 Cal. 522; 20 Am. St. Rep. 239.)   A contract cannot
be rescinded when the parties to it cannot be placed *in
statu quo* (*State* v. *McCauley*, 15 Cal. 458); nor re-
scinded in part and affirmed in part. (*Bohall* v. *Diller*,
41 Cal. 533; *Raymond* v. *Bearnard*, 12 Johns. 276; 7 Am.
Dec. 317.)   There is no cause of action for damages, as
such, for the deceit of Sharon, as there is no averment
of damages, as such, nor claim for damages, out of the
individual estate of Sharon   (*Bohall* v. *Diller, supra*;
*McKinlay* v. *Tuttle*, 42 Cal. 570; *Holton* v. *Noble*, 83 Cal.
9; *Palmer* v. *Reynolds*, 3 Cal. 396; 5 Am. & Eng. Ency.
of Law, 53, and cases cited); and the whole frame
of the amended complaint which prays only for recov-
ery out of the trust estate of Ralston in the hands of de-
fendants excludes any idea of recovery of damages, as
such, against the estate of Sharon. (*People* v. *Mier*, 24
Cal. 71; *Morrison* v. *Bowman*, 29 Cal. 354; *Arrington* v.
*Liscom*, 34 Cal. 375; 94 Am. Dec. 722; *Nevada etc. Co.* v.
*Kidd*, 37 Cal. 283; *Mayo* v. *Tomkies*, 6 Munf. 527; *Stock-
ton etc. Assn.* v. *Chalmers*, 75 Cal. 332; 7 Am. St. Rep.
173.)   No cause of action purely *ex delicto* for damages
for Sharon's deceit could survive the death of Sharon,
or pass by assignment from James W. Burling to his
assignee in insolvency. (*Oliver* v. *Walsh*, 6 Cal. 456;
*Lawrence* v. *Martin*, 22 Cal. 173; *Tufts* v. *Matthews*, 10 Fed.
Rep. 609; *In re Crockett*, 2 Nat. Bank. Reg. 209; *Lam-
phere* v. *Hall*, 26 How. Pr. 509; *Read* v. *Hatch*, 19 Pick.
47; *Newsom* v. *Jackson*, 29 Ga. 61; *Henshaw* v. *Miller*, 17
How. 212; *Cutting* v. *Tower*, 14 Gray, 183; *De Hoghton* v.

*Money,* L. R. 2 Ch. App. 164; *Brush* v. *Sweet,* 38 Mich. 574.) No case of constructive trust is chargeable upon defendants, since there are no allegations ear-marking the $200,000, or showing specifically what became of it. (2 Pomeroy's Equity Jurisprudence, sec. 1048; *Stephens* v. *Board of Education,* 79 N. Y. 183; 35 Am. Rep. 511; *Burnett* v. *Gustafson,* 54 Iowa, 86; 37 Am. Rep. 190; *Mills* v. *Swearingen,* 67 Tex. 269; *Carlton* v. *Conroy,* 21 Cal. 170; *Lathrop* v. *Bampton,* 31 Cal. 17; 89 Am. Dec. 141; *Gillespie* v. *Winn,* 65 Cal. 429; *Rowland* v. *Madden,* 72 Cal. 18; *Ex parte Dumas,* 1 Atk. 232; *Ryall* v. *Rolle,* 1 Atk. 172; *Scott* v. *Surman,* Willes, 403; Perry on Trusts, sec. 345.) Since the amended complaint discloses no cause of action, and the demurrer was properly sustained upon each ground set forth in the demurrer, the refusal of leave to amend generally, without any showing of the particulars in respect of which an amendment was desired, or offering to file any particular amendment, was not an abuse of discretion. (*Martin* v. *Thompson,* 62 Cal. 619; 45 Am. Rep. 663; *Nevada etc. Co.* v. *Kidd, supra; Canfield* v. *Bates,* 13 Cal. 606.)

BEATTY, C. J.—This is an action against the trustees of the estate of William Sharon, deceased, to compel an accounting of the trust estate of W. C. Ralston, deceased, of which estate said William Sharon was trustee in his lifetime, and which, it is alleged, has come into the hands of these defendants, as volunteers and with notice of the trust.

In the superior court a demurrer to the amended complaint was sustained without leave further to amend, and judgment thereupon entered in favor of defendants, from which plaintiffs appeal.

The principal ground of demurrer was, that the complaint did not state facts sufficient to constitute a cause of action, and, as we understand, this was the ground upon which it was sustained, and leave to amend refused. It is also the ground upon which the respondents have mainly relied in their oral and printed arguments

in this court.    It is essential, therefore, to ascertain at
the outset what the allegations of the complaint are.
The great length of the complaint renders this task
somewhat difficult, and the difficulty is enhanced by the
manner in which it commingles allegations of fact with
legal conclusions, matters of evidence, and inferences
not always justified by the facts alleged.    I shall en-
deavor to state the general nature of the case first, and
afterward, in discussing the more specific grounds of
the demurrer, to give the full effect of the allegations
claimed by defendants to be insufficient.

It is alleged that William Sharon and W. C. Ralston
were, for a number of years prior to the death of Ral-
ston, partners under the firm name of William Sharon
& Co., and as such jointly interested in various corpo-
rations and business enterprises, and owners of large
interests in real and personal property.    Prior to 1873,
Ralston was cashier of the Bank of California at San
Francisco, and Sharon its agent at Virginia City, Ne-
vada.    In July, 1873, Ralston became president of the
bank, and Sharon, having removed to San Francisco,
became a director.    Both prior and subsequent to this
time, according to the allegations of the complaint, the
affairs of the bank were grossly misconducted by its
directors and other officers, and, on the twenty-sixth
day of August, 1875, it failed, and on the next day Ral-
ston was accidentally drowned.    Just prior to his death
he executed and delivered to Sharon a deed in the fol-
lowing terms:

"William C. Ralston to William Sharon.    Know all
men by these presents: That I, William C. Ralston, of
the city and county of San Francisco, state of Califor-
nia, in consideration of the sum of —— dollars, gold
coin of the United States, to me in hand paid by Will-
iam Sharon of the same place, and other good and
valuable considerations, receipt whereof is hereby ac-
knowledged, do hereby give, grant, convey, and transfer
unto the said William Sharon, his heirs and assigns, all
and singular, my property, both real and personal, in

the city and county of San Francisco, the county of San Mateo, and elsewhere, and wheresoever or howsoever situated, in trust, to collect and receive the rents, issues, incomes, and profits thereof, and every part thereof, and to sell and dispose of the same on such terms and prices as he deems best, and to apply the same and the proceeds thereof, and of the property hereby conveyed, to such purposes and uses as the said Willim Sharon may in his judgment deem best for our joint and several interests.

"To have and to hold, all and singular, the above mentioned and described premises, together with the appurtenances, unto the said Wm. Sharon, his heirs and assigns, forever.

"In witness whereof, I have, on this twenty-seventh day of August, 1875, hereunto set my hand and seal.

[SEAL]    "W. C. RALSTON."

It is of the trust created by this deed that the plaintiffs seek an accounting, basing their claim upon the theory that it was an express trust to pay the debts of Ralston, and that their testator and assignor were creditors. The facts alleged in support of the claim that they were creditors are, that Ralston, prior to 1872, employed William Burling, a broker, to borrow money for him to a large amount, Burling giving his own notes to the lenders and Ralston furnishing the necessary collaterals, consisting principally of stock of the Bank of California, estimated, apparently, for the purpose of security, at $100 per share. In 1872 William Burling and James W. Burling became partners under the firm name of Burling and Brother, after which time moneys were procured for Ralston by said firm in the same manner that William Burling had procured them before. When Ralston died, there were outstanding notes of this character given by William Burling to the amount of $155,000, and notes of Burling and Brother to the amount of $1,613,000; in all $1,768,000, secured to the extent of $1,253,000, by 12,530 shares of the stock of the Bank of California, and to the extent of $515,000,

by stocks and bonds of the Spring Valley Water Company, and stocks of certain mining companies.

Neither of the Burling brothers ever knew or sought to know for whom they were borrowing these moneys. They dealt exclusively with Ralston, and delivered the proceeds of all loans to him, but received from him no evidence of indebtedness. These are all the material facts bearing upon the question whether the Burlings were creditors of Ralston at the date of his death, and of the execution of the trust deed to Sharon.

The plaintiffs in this action sue as executor and executrix of William Burling, who died in 1877, and as assignee of James W. Burling, who subsequently became an insolvent debtor. The partnership affairs of Burling and Brother were wound up and settled in 1879. Relief is sought upon the ground of fraud, alleged to have been practiced by Sharon as follows:

On the 27th of August, 1875—the day of the execution of the trust deed and of Ralston's death—Sharon called on the Burlings for the purpose of ascertaining the amount of their promissory notes outstanding for moneys supplied to Ralston as above detailed, and was furnished with a schedule of the notes and securities. On the following day he called on them again and informed them that all the shares of the stock of the Bank of California pledged as collateral for their notes were false and fictitious, having been fraudulently overissued by Ralston, and stated that they would be compelled to pay the full amount of all notes so secured. To this they replied, among other things, that they would dispose of the other stocks and bonds deposited as security for the other notes, and, after applying any surplus of their proceeds to the payment of the notes secured by the bank stock, they would pay or settle the deficiency, and resort to the estate of Ralston for the balance of their claims, including their commissions for brokerage, etc. Sharon thereupon informed them that the stock and bonds of the Spring Valley Water Company, and of the said mining companies, held as security for the

other notes, had been surreptitiously abstracted from the Bank of California by Ralston, and that, as against the owners, they could not be held except as security for the particular notes for which they were pledged. He further assured them that Ralston had died entirely and hopelessly bankrupt; that his estate was of no value, and that they could not expect to be reimbursed therefrom for any considerable part of the money they would be compelled to pay to the holders of their notes. In answer to their inquiry he denied that he was or had ever been a partner of Ralston, and stated that their joint operations had been all closed, in which Ralston had beaten and wronged him to the extent of between two and three millions of dollars. He further stated that Ralston had stolen and embezzled almost the entire paid-up capital of the Bank of California, amounting to nearly five millions of dollars.

It is to be inferred from the allegations of the complaint, but is not clearly stated, that at the time of this interview the Burlings knew of the trust deed to Sharon, and of its terms, as well as the circumstances surrounding its execution so far as they affected its construction, and their rights under it. Having made these representations as to the amount of Ralston's indebtedness, the condition of his estate, and the criminal practices in which he had been engaged, Sharon proposed to the Burlings that if they would give him $500,000, he would have D. O. Mills join him in assuming and paying their outstanding notes, but if they would not accede to this proposition they would themselves be compelled to pay whatever deficiency might remain after application of the proceeds of the securities (which he represented as generally worthless), and this, as he pointed out to them, would result in their bankruptcy and ruin.

All these statements of Sharon were believed by the Burlings to be true. He was a man prominent in business, reputed to be very wealthy, a director of the Bank of California, and fully entitled to credit in such matters.

They knew, moreover, that he had been long and intimately associated in business with Ralston, and that no man living had had equal opportunities to learn the true condition of Ralston's affairs, while they themselves had no knowledge of the condition of Ralston's estate, or means of discovering it.   They were, therefore, inclined to make the arrangement suggested, but, in order to obtain better terms, carried on a negotiation lasting nearly four months, during which they had frequent interviews with Sharon.   During these various interviews ·he repeated, reiterated, and amplified his original statements, and these statements were indorsed by D. O. Mills, the president of the Bank of California, by its cashier and by a number of its directors.

Induced by their belief in these representations the Burlings, on the twenty-fourth day of December, 1875, finally agreed to pay to Sharon the sum of $200,000, and to assign to him a verified claim against the estate of Ralston for the amount of their outstanding notes, in consideration of which Sharon agreed that he and D. O. Mills would unite in assuming payment of the Burlings' notes, and would relieve them of all liability arising therefrom.   In pursuance of this agreement, said sum of $200,000 was paid to Sharon on said date, as follows: William Burling, on account of his individual notes for $155,000, paid the sum of $17,533.94, and Burling and Brother, on account of the firm notes for $1,613,000, paid the sum of $182,466.06, and they did make and verify claims against the estate of W. C. Ralston for the full amount of all their promissory notes, and assigned the same to Sharon.

It is alleged that all the representations of Sharon by which the Burlings were induced to make this payment were false, and made by Sharon with full knowledge of their falsity for the purpose of defrauding the Burlings out of the sum demanded by Sharon as a condition of his assumption of their obligations.   It is alleged that Ralston's individual indebtedness was comparatively small; that he was a partner of Sharon; that the money

borrowed through the Burlings was borrowed princi-
pally for the firm of William Sharon & Co.; that Sharon
was largely indebted to the firm, and liable for most of
Ralston's apparent indebtedness; that the firm had as-
sets of great value, and, in short, that during the whole
period of the negotiations between Sharon and the Bur-
lings he had in his hands property justly applicable to
the payment of Ralston's debts more than sufficient for
the purpose.   It is further shown that during these
negotiations he was also negotiating with the holders of
the Burlings' notes, and that before the payment of the
said $200,000 he had actually, as trustee of Ralston, and
out of the proceeds of his trust estate, paid off or com-
promised and settled the last dollar of their said indebt-
edness, and had had assigned to him all of said notes
with their securities, so that, without their knowledge,
they were, at the date of said payment, absolutely free
from the liability from which they were seeking relief.

These are, in general terms, the facts constituting the
fraud alleged to have been consummated by Sharon on
the twenty-fourth day of December, 1875, on account of
which the plaintiffs are seeking relief in this action.
But the action was not commenced until October, 1886,
nearly eleven years after the cause of action arose, and
a large part of the complaint is composed of allegations
excusing the failure of the Burlings and their successors
to make an earlier discovery of the fraud, and thereby
to escape the effect of the statute of limitations and the
doctrine of laches.   The substance of the general allega-
tions under this head is that neither William nor James
W. Burling, nor their successors and representatives,
the plaintiffs in this action, ever had any knowledge of
the falsity of Sharon's representations, or of any fact to
arouse their suspicions or put them upon inquiry, or
supplying any clue to the ascertainment of the truth,
until within one year prior to the commencement of the
action; that Sharon continued from the date of the set-
tlement of their indebtedness until the day of his death,
in November, 1885, by active misrepresentation, and by

suppression and concealment of books, documents, and other evidence, to lull their suspicions, and to make it impossible for them to discover the true condition of Ralston's estate and the actual extent of his liabilities. In support of these general averments the plaintiffs detail the discoveries that they have made, the manner in which they were made, and the reasons they were not made sooner.

In order to charge these defendants it is alleged that Sharon, in his lifetime, conveyed all his property to them in trust, to collect the income, pay his debts, and afterward to distribute, first the income, and finally the body of the estate to his children and certain other beneficiaries designated in the deed; that under said conveyance the defendants have taken into their possession, as part of the Sharon estate, a surplus of some millions belonging to the trust estate of Ralston, which they hold upon the same trust with which it was charged in the hands of Sharon. The prayer is for an accounting of the Ralston estate, and for a decree that defendants pay to the plaintiffs out of any surplus thereof the sum of $200,000, with interest from December, 1875.

The theory of plaintiffs' action, as disclosed by the whole frame and tenor of their complaint, as well as by the repeated declarations of counsel in the course of the argument, is simply this: That on the twenty-seventh day of August, 1875, they were creditors of Ralston in the sum of $1,768,000, and so continued until December 24, 1875; that by Ralston's deed to Sharon of August 27, 1875, all of Ralston's estate was transferred to Sharon for the benefit of Ralston's creditors, or, in other words, that Sharon, by accepting the deed and transfer, became the trustee of an express trust, of which all of Ralston's creditors, including William and James Burling, were the beneficiaries with a vested interest in the trust estate; that their claims to the extent of $200,000, with interest from December 24, 1875, remain unpaid, and therefore that they are entitled to an accounting by the successors of Sharon in

the trust, and to full payment out of the trust funds remaining in the hands of the trustees, if sufficient for that purpose, and if not sufficient then to a payment *pro rata* as far as the fund will go. The soundness of this theory, and the validity of the claims based upon it, are contested at every point.

In the first place it is contended that it does not appear from the complaint that the Burlings were creditors of Ralston when his trust deed was executed, while it does appear that if they were creditors in any sense at that time they ceased to be such on the twenty-fourth day of December, 1875, when they assigned their claims to Sharon.

This contention cannot be upheld. There can be no doubt that the Burlings were creditors of Ralston. They dealt with him alone, and he did not assume to be acting as agent for any other person. The credit was given to him, and when the Burlings advanced him money at his request a promise to repay it was implied, if not made in express terms. They were creditors to the amount of their advances, and their advances equaled the amount of their notes. This would be true, independent of any provisions of the code; and is clearly so under its definition of debtor and creditor. (Civ. Code, secs. 3429, 3430.) Nor did the Burlings cease to be creditors by reason of their assignment to Sharon, for they have a right to repudiate an assignment procured by fraud. Still less did the settlement of their notes, and the extinguishment of their liability on that account destroy their *status* as creditors, for they contributed $200,000 toward the payment of their notes, and the fact that the notes had already been paid, which was concealed from them, and purposely concealed in order to induce them to make the payment, cannot be used to their disadvantage by Sharon or his successors in the trust. The effect of the transaction as to them was just the same as if they had themselves paid their notes to the extent of $200,000, and the advantage to Ralston's estate was even greater, for it appears that Sharon was

able to settle the notes at a considerable discount, and that he used the $200,000 contributed by the Burlings to pay off and extinguish mortgages and other liens upon Ralston's property.

For the purpose of the argument, upon this point counsel assume, and I am assuming, that Ralston's deed created a trust for the benefit of his creditors, and that Sharon was not only his trustee, but a trustee of all his creditors. This being so, the Burlings had a right to deal with him on the credit of the trust estate. If they paid their notes directly or indirectly, in whole or in part, they had an undoubted right to look to the trust estate for reimbursement; and, if they were induced by a fraud of the trustee, practiced for the benefit of the trust estate, to part with their claims against it, they had a right, upon discovery of the fraud, to reassert their claims, and were not compelled to rely upon the personal liability of the trustee for his deceit. If they had known, what is now alleged to be the fact, that Ralston's estate was ample for the payment of all his debts, undoubtedly they would have looked to it for reimbursement. Being induced by a fraudulent concealment of that fact, and of the fact that their notes had been already taken up, to part with $200,000—which went into the trust fund—the course they then pursued in consequence of that fraud ought not to shut them out from any benefit they would have enjoyed if the deception had not been practiced. The fact that Sharon and his estate have always been amply sufficient to respond to a personal claim against him for the $200,000, which he induced the Burlings to pay, can make no difference. The right of the plaintiffs in the trust fund and the rule of law is the same as if Sharon had been a man of no means, or insolvent.

Another point made by respondents in support of their general demurrer is, that the plaintiffs are not entitled to equitable relief, because they do not come into court with clean hands. It is contended that by making out and assigning to Sharon a verified claim against

Ralston's estate for the whole amount of their notes, they entered into a deliberate conspiracy with Sharon to defraud the estate of Ralston out of the value of the collaterals pledged by him as security for those notes, and of all the money saved in the settlement with their creditors.    But this, it seems to me, is putting a wrong construction on that transaction.    If the notes were paid according to the understanding upon which the Burlings advanced their $200,000, the collaterals would be taken up by Sharon, and would go back into the Ralston estate, so far as they were originally his property—that is to say, Sharon would be accountable to the estate for them; and, therefore, the estate was entitled to no deduction on that account from the amount of the Burlings' notes, and whoever paid them would have a rightful claim against the trust estate for the amount paid.    The understanding was that they were to be paid —not bought in at a discount—and they were to be paid by Sharon for the Burlings, who, in consideration that Sharon was to furnish over a million and a half of dollars for their protection, agreed to assign the entire claim to him.    The result was that the estate got back all its securities and was charged no more than it owed. In only one respect can it be said that the estate was to be defrauded.    A trustee cannot make a profit out of his trust.    He cannot speculate upon the trust estate, and so Sharon, if he had paid the Burlings' notes in full, could not in any event have made a charge against the estate of the whole sum, because $200,000 of it had been contributed by the Burlings.    It may be said that they, by putting in a verified claim for the whole amount of their notes, were helping him to make that $200,000 for himself out of the trust estate.    But he could only make money in that way out of a solvent estate, and the understanding upon which they made the payment was that the estate was utterly insolvent, and that Sharon was going to advance most of the money to pay their notes out of his own pocket, so that by making a claim for the full amount of their notes, and assigning it to

him, he would get a dividend of less amount than his advances. In this view of the transaction, it does not seem that they were attempting any fraud upon Ralston's estate. If carried out according to their understanding and intention, the estate was to get back all its collaterals, it was to be charged no more than Ralston was actually liable for, both the Burlings and Sharon were to be heavy losers, and other creditors were to suffer no prejudice in the dividend.

It is further contended in support of the general demurrer that the Burlings could not retract their assignment to Sharon and regain the position of creditors of Ralston's estate without a rescission of the contract by which Sharon assumed and paid their notes; that they cannot rescind without putting him *in statu quo*, and that they not only have not restored or offered to restore him to his former position, but they cannot possibly do so. It is a sufficient answer to this proposition to say that on the case made by the complaint there was nothing to be restored to Sharon. In paying the Burlings' notes he simply discharged his duty as trustee, and they were all settled before he received the $200,-000. He, therefore, received that sum without parting with anything. What, under these circumstances, were the Burlings to tender back as a condition of reclaiming their $200,000?

Upon the assumption of the creation of an express trust for the benefit of Ralston's creditors by his deed to Sharon (upon which the argument has thus far been considered), and aside from the question of laches or the statute of limitations, there is not, in my opinion, any failure to state a cause of action.

But was there such a trust?

As to this proposition, which is fundamental to the case, we have been favored with very little argument by counsel for appellants. In their opening brief they content themselves with saying: "That Sharon was a trustee of an express trust, and that William and James W. Burling and the firm of Burling Brothers were bene-

ficiaries thereof is admitted. The deed to Sharon and his declarations thereunder place beyond discussion this proposition." And in the subsequent course of the argument the same declaration has been repeated again and again.

But counsel for respondents contend that there never was any express trust in favor of creditors, and that neither of the Burlings has ever had any interest in the trust estate by virtue of the trust deed or any declaration of Sharon made thereunder.

The mistake of counsel for appellants in treating this as a conceded proposition seems to have arisen in part from his notion that the repeated allegations in the complaint, that Sharon was such a trustee and the Burlings such beneficiaries, were confessed by the demurrer. But a demurrer does not confess a conclusion of law or the construction of a written instrument which is set out in terms, together with the circumstances surrounding its execution. As to these matters the court looks to the terms of the instrument and the facts alleged, and draws its own conclusions and places its own construction. Now here a reference to the terms of Ralston's deed above set forth will show that it does not mention either of the Burlings by name, or the creditors of Ralston as a class. Looking to its terms alone no one could infer that Ralston had a thought of creditors in his mind. But the circumstances by which he was surrounded give a clue to his motives, and they may be resorted to for the purpose of determining what his intentions were.

What, then, is the intention which they disclose?

In my opinion they add nothing to the intention manifested by the deed itself, and that is an intention on the part of Ralston to create a trust for his own benefit. He was, according to the theory of the complaint, the possessor of an ample fortune—more than sufficient to pay all his debts. He was president of a bank which had just failed as a consequence of his mismanagement, but he had not been guilty of the crimi-

nal practices alleged by Sharon, and there was no reason why he should take his own life. In fact, he did not do so, for it is alleged that his death, following upon the heels of the bank's failure, was accidental. But he was deeply in debt, and his affairs generally were in such a condition that he felt unable to extricate himself from the difficulties by which he was surrounded. In this situation he turned to his friend and business associate, a man of large fortune and available means, who, on account of their joint interests, would have the strongest motives to prevent a sacrifice of his property to the sudden demands of his creditors. To him he said in effect: "Here is all I have; take it and deal with it in the best manner you can, according to your judgment, for the protection of our joint interests and of my several interest." Of course it was incidental to the execution of such a trust that Ralston's creditors should be dealt with and satisfied, because otherwise they would exercise their right to set aside the conveyance; but they did not for that reason acquire a vested interest in the estate—which was in no manner charged with the payment of their claims either in full or *pro rata.* Sharon, under the authority conferred, had a right to make any terms of composition or settlement with Ralston's creditors that he could secure, and in so doing he dealt with them at arm's length, for Ralston's deed did not by its terms or by the circumstances of its execution make Sharon their fiduciary, and it does not appear that in dealing with the Burlings or other creditors he made any declarations or representations to the effect that he was charged with any duty as to them.

As to this point, counsel for appellants, at the close of the oral argument upon the rehearing, asked and obtained leave to file authorities in support of his proposition that the Burlings were beneficiaries of an express trust, but he has failed to produce any that are in point. He cites the provisions of the Civil Code relative to voluntary assignments for the benefit of creditors (Civ. Code, sec. 3449, et seq.), but it is clear that they have

no application. This assignment did not purport to be for the benefit of creditors, and no inventory or schedule was ever filed. There was never a pretense at any time or by any person that this was an assignment under the statute, and the Burlings especially did not treat it or rely upon it as such.

Considered without reference to the statute, and in the absence of any citation of decided cases or text-writers, it would seem to be sufficient to quote the language of Professor Pomeroy in his discussion of the question as to what words or dispositions are sufficient to create a trust. " No precise form of words is necessary to create a trust, but the intention must be clear. The fact that a trust of lands *is created* must not only be manifested and proved by a writing properly executed, but it must also be manifested and proved by such a writing what the trust is. The declaration of trust, whether written or oral, must be reasonably certain in its material terms, and this requisite of certainty includes the subject matter or property embraced within the trust, the beneficiaries or persons in whose behalf it was created, the nature and quantity of the interests which they are to have, and the manner in which the trust is to be performed. If the language is so vague, general, or equivocal that any of these necessary elements of the trust is left in real uncertainty, then the trust must fail." (Pomeroy's Equity Jurisprudence, sec. 1009.) In view of this doctrine, there seems to be no foundation for the claim that Ralston's deed created a trust for creditors, though it did undoubtedly create a trust for Ralston. It empowered Sharon to sell and dispose of the property for his benefit, to advance money to prevent it from being sacrificed, and, generally, to deal with it as if it were his own, but Sharon was bound to restore the surplus to Ralston on his demand, and to account to him for the entire estate.

If this was the effect of the deed according to its terms, how was it changed by Sharon's subsequent declarations? These declarations are referred to in various

parts of the complaint, but never set forth in any defi-
nite form. The most direct and certain averment as to
what they were is found at folio 1040 of the record,
where it is alleged that Sharon declared in writing
"that said deed of conveyance was intended by said W.
C. Ralston to create a trust for the payment of his debts."
In another connection (fols. 102–05) Sharon's declara-
tions in writing, though not directly averred, are set
forth in greater detail as follows: "That said Sharon
intended to do with the estate of said Ralston, so con-
veyed to him, as if said Ralston had lived, namely, to
cover existing and contingent indebtedness of said Ral-
ston to him, said Sharon, and to secure himself on any
deficiency that he might suffer in settling the debts and
liabilities of the said Ralston, and to secure said Ral-
ston's proportion in certain joint ventures in which said
Ralston and he were associated together, and to pay the
debts of said Ralston as far as the estate would pay the
same, and to compromise and settle as far as possible
all claims existing against it; whatever might be left
after payment and settlement of said debts of said Ral-
ston would be accounted for to the sole legatee and ben-
eficiary of said W. C. Ralston, his widow, and that
whatever benefit could be derived from said estate for
said widow from his, said Sharon's, careful administra-
tion thereof, would be so divided for her benefit."

These declarations are perfectly consistent with the
deed as above construed. The deed certainly did create
a trust, and one of the objects of its creation and a
necessary incident to its execution was payment or set-
tlement of Ralston's debts, but the sole beneficiary was
Ralston, and after his death his widow. The creditors
did not become beneficiaries with a vested interest in
the estate merely because, as an incident to the execu-
tion of the trust, their claims must be settled.

But even if these declarations had been more certain
and definite than they were, to the effect that the trust
was for the benefit of the creditors, they must have been
ineffectual because this trust was created by a deed exe-

cuted by the owner of the property, and the rule is that a trust created in writing cannot be varied by a subsequent declaration of the trustee. (Perry on Trusts, sec. 86.)    If Ralston by his deed made himself and his successors sole beneficiaries of the trust, Sharon could not vest an interest in the estate in other beneficiaries of his own selection.

My conclusion is that neither by the trust deed nor by Sharon's declarations did the Burlings become beneficiaries of the Ralston trust, with such an interest in the trust estate as entitled them to demand an accounting of the trustees.

It is not clear, from the argument of appellants' counsel, that he relies upon the use of the $200,000 obtained from the Burlings to clear off the liens upon the trust estate as a fact constituting the Burlings beneficiaries. He cites no authority to sustain such a claim, and the authorities cited by respondents are against him.    The $200,000 is not ear-marked or followed into any property in the hands of the trustees; and, although used for the benefit of the trust estate, there was no agreement that it should constitute a lien, and without such agreement by the trustee there could be no lien.    (*New v. Nicoll*, 73 N. Y. 127; 29 Am. Rep. 111, and cases cited.)

This disposes of all the grounds relied upon by counsel to establish an express trust of the Ralston estate for the benefit of the Burlings, and it remains only to notice some general arguments in support of the sufficiency of the complaint.

It is much insisted upon that the allegations confessed by the demurrer disclose a case of gross fraud practiced upon William and James W. Burling, for which a court of equity should be eager to afford relief.

This is entirely true.    Accepting the complaint as a correct statement of the facts, it appears that William Sharon did defraud the Burlings of $200,000, for the recovery of which I have no doubt a cause or causes of action accrued to them immediately upon the pay-

ment of the money. But it was .a cause of action against Sharon personally, and against the $200,000 so far as it could be traced and identified, and no further. As no facts are alleged by which that money could be traced into any specific property now in the hands of these defendants as trustees either of Ralston or of Sharon, the claim of plaintiffs has become a mere personal demand against Sharon, enforceable like other claims of the same character. This, it seems to me, constituted the cause or causes of action, and the only causes of action which the plaintiffs had when this suit, based upon an entirely different theory and claiming different relief, was commenced. All that is sought here is an accounting of the Ralston estate and payment out of that fund, while the facts disclose no right to such accounting or payment in that mode, but only a claim or claims against Sharon's representatives.

This, however, is not an action against Sharon's representatives; for although the defendants are designated in the title of the complaint as trustees of William Sharon, all its allegations, its frame and theory, not to mention the repeated declarations and disclaimers of counsel throughout the argument, demonstrate that they are sued, and that the intention is to charge them, not as representatives of Sharon, but as trustees of W. C. Ralston's estate. In that capacity they are clearly not liable.

This conclusion renders it unnecessary to discuss the question of *laches* or the bar of the statute of limitations, for, irrespective of those questions, it must be held that the demurrer was properly sustained.

Appellants have made no point in the argument upon the refusal of leave to amend, probably for the reason that they have never specified either in the superior court, or in this court, any amendment that they could make, or that they desired to make.

In the absence of such a specification it cannot be held that the superior court abused its discretion in de-

nying leave to amend. (*Martin* v. *Thompson*, 62 Cal. 619.)

Judgment affirmed.

HENSHAW, J., TEMPLE, J., VAN FLEET, J., GAROUTTE, J., and HARRISON, J., concurred.

McFARLAND, J., concurring.—I concur in the judgment of affirmance. I also concur in the conclusion that the deed from Ralston to Sharon did not create a trust in favor of Ralston's creditors, and the only action which the Burlings had, if any, was against Sharon personally. In this view it is not important whether or not the Burlings were creditors of Ralston. Upon the question of the statute of limitations and laches I adhere to my former opinion (39 Pac. Rep. 49), as follows:

" Moreover, we think that the action is barred by the statute of limitations, and is stale from *laches*. Of course, the statutory period has run two or three times unless the case is saved by the clause of section 338 of the Code of Civil Procedure, which provides that in an action based upon alleged fraud, the statute does not commence to run until the discovery of the facts constituting the fraud. This action is founded upon the contract between the Burlings and William Sharon, made on December 24, 1875, which was an executed contract; and the statute commenced to run on that day, except so far as its running was delayed by a want of knowledge of the fraud by which said contract is alleged to have been procured. But ' the means of knowledge are the same thing, in effect, as knowledge itself' (*Wood* v. *Carpenter*, 101 U. S. 143), and one who makes a charge of fraud for the first time, many years after its alleged perpetration, must show that within a reasonable time he has used due diligence to discover it, has followed up circumstances which would have put a prudent man upon inquiry, and has not slept upon his rights until the lapse of time and the death of parties

charged with the fraud have destroyed the means of a full, fair, and satisfactory investigation in a court of justice. Moreover, in such a case, the complaint must state facts from which it will appear to the court that ordinary prudence could not have discovered the fraud within the statutory period. 'The circumstances of the discovery must be fully stated and proved, and the delay which has occurred must be shown to be consistent with the requisite diligence.' (*Wood* v. *Carpenter, supra.*) Statutes of limitations are in great part founded upon the probability that during the course of many years witnesses will die, and recollections of events long past will become indistinct in the memories of the living.

"In the case at bar sufficient facts are not stated to show that the alleged fraud could not, with requisite diligence, have been sooner discovered. There was great opportunity for discovering the fraud, if any such existed, before the contract between the Burlings and William Sharon was made. That contract was not made in a hurry. Sharon's representations, alleged now to have been false, were not immediately accepted as true and promptly acted upon. Negotiations were continued for four months. Ralston, as appears from the complaint, was widely known in business circles, and had been accredited with great wealth. It is averred in the complaint that he was perfectly solvent, and that he had real and personal property, which passed to Sharon under the deed, of the aggregate value of $9,000,000. It is averred, also, that he had real property of the value of $6,000,000. If that was the fact, and the Burlings really had a legal claim against Ralston, it is almost beyond comprehension why they did not discover it, if not before the $200,000 contract, at least before the death of William Burling, or before the lapse of the statutory period of limitation. The slightest examination of public records would have put them on the trail of the fact. It does not appear that they demanded an examination of the books, papers, etc., of Ralston. But no discovery was made, and it does not appear that any reasonable

efforts were made for a discovery of the alleged facts
upon which this action rests, until ten years after the
date of the contract, and until after the death of said
William Sharon.    And it is averred that *then* 'the means
by which they obtained any information was by inquir-
ing among their friends and acquaintances whether
they, said persons, had any information relating to the
dealings of said Sharon with said trust estate, and
whether they had any information regarding the prop-
erty which was conveyed by said Ralston to said Sharon
in trust, as aforesaid.'    But such means were always
within the power of appellants and the Burlings; and
there are no sufficient facts alleged to show that the de-
lay is 'consistent with the required diligence.'    (See
Angell on Limitations, secs. 187, 190; *Hecht* v. *Slaney,*
72 Cal. 363; *Moore* v. *Boyd,* 74 Cal. 167.)

"Moreover, apart from the question of strict statutory
limitation, the claim of appellants is too stale to be en-
forced in a court of equity.    'No rule of law is better
settled than that a court of equity will not aid a party
whose application is destitute of conscience, good faith,
*and reasonable diligence,* but will discourage stale de-
mands, for the peace of society, by refusing to interfere
when there has been gross laches in prosecuting rights,
or where long acquiescence in the assertion of adverse
rights has accrued.    The rule is peculiarly applicable
where the difficulty of doing entire justice arises through
the death of the principal participants in the transactions
complained of, or of the witness or witnesses, or by rea-
son of the original transaction having become so obscured
by time as to render the ascertainment of the exact facts
impossible.'    (*Hammond* v. *Hopkins,* 143 U. S. 250.)
In speaking of this rule, this court, in *Bell* v. *Hudson,* 73
Cal. 288, 2 Am. St. Rep. 791, said: 'It is a material cir-
cumstance that the claim was not made *until after the
death* of those who could have explained the transaction.'
In the case at bar William Burling and William Sharon,
'the principal participants in the transactions com-
plained of,' were both dead before the commencement

of the action. It is quite apparent that no court could do 'entire justice' in the premises without the testimony of William Sharon. Of course, if the suit had been commenced within a reasonable time, and William Sharon had died before his testimony could have been taken, the want of his testimony would simply have been one of those natural misfortunes which sometimes come to litigants. But William Sharon lived for ten years after the transaction complained of. William Burling died two years after the transaction, fully satisfied—as is averred—that it was a fair one. James W. Burling did business for several years afterward, and, until he became an insolvent, was also satisfied with the fairness of the transaction. There was perfect acquiescence by all parties for ten years, and while Sharon lived. It was not until he died, and his testimony was forever beyond human reach, that the claim of appellants grew up and took the form of a suit against his successors. It is a claim which equity should not now entertain."

Rehearing denied.