[Civ. No. 4478. Third Appellate District.—January 19, 1932.]

GERTRUDE SAINT, Appellant, v. HARRY Y. SAINT, etc., et al., Respondents.

16

William A. Wight and Hedley Richmond for Appellant.

Haight, Mathes & Sheppard, Raymond L. Haight, James C. Sheppard, Haight & Trippet, Mathes & Sheppard, Arthur L. Syvertson and Richards, Gilbert & Conklin for Respondents.

PRESTON, P. J.—This is an action to establish a trust in certain real property situate in Los Angeles County formerly owned by William M. Saint.

Demurrers were interposed to the complaint by Carrie I. Davis Dubbs and Wilbur L. Y. Dubbs, individually, and as executors of the last will and testament of Hannah Y. Saint, deceased, and a separate demurrer was interposed by the defendant Harry Y. Saint. The court sustained the demurrers as to each defendant without leave to amend. Judgment of dismissal was then entered. From this judgment the plaintiff Gertrude Saint prosecutes this appeal.

The complaint is based upon facts alleged to have occurred in 1904 and 1905, more than twenty-five years ago. The

complaint, when divested of all superfluous matter, may be briefly summarized as follows:

Appellant is now and has been since 1904 the wife of Otto R. Saint and the daughter-in-law of William M. Saint, deceased. William M. Saint was the father of Harry and Otto R. Saint and the husband of Hannah Y. Saint. William M. Saint died a resident of Los Angeles on December 20, 1904, leaving surviving him said two sons above named, and his said widow Hannah Y. Saint. His estate consisted in part of real property in the city of Los Angeles, which was appraised in the course of administration at $18,000 and is now alleged to be of the value of $185,000. On the death of William M. Saint, his son Otto R. Saint, the husband of plaintiff and appellant, a resident of New York, was insolvent and indebted to various creditors in the sum of approximately $30,000. On December 25, 1904, Harry Y. Saint, who at that time was in Los Angeles, wrote his brother Otto R. Saint, in part, as follows:

"Sunday 12/25/04.

"My Dear Bro. . . . Father died of acute consumption following a cold and subsequent pneumonia . . . he left no word for anyone and did not ask to see anyone. He was informed of your request, but said matters were as they should be. . . . He voted at election time purposely establishing his residence in California. We will settle all matters out of court, if permitted to do so by your creditors. In fact there is little to settle. His property has been dissipated—as you know probably better than the rest of us. What it will amount to I cannot tell, but will be about ½ what I thought his estate would be.

"I have nothing to say to you at this time about your dealings with Father. You promised me in New York that you would not advise Father further in his investments. I have scrupulously refrained from so doing for years. You failed to do as much. His losses in steel, from his letters to me, were the beginning of his decline, resulting in his death. In saying that I have said all I ever intend to say on that subject.

"Now as to the future;—Father left no will. If anything is left out of the remnant of his estate for you, I intend that your wife shall have it and not your creditors. Ma

is equally determined, but has left methods to me and apart of these methods she must never know and don't want to know, for I never intend that she shall ever be compelled to testify to anything a shade off color in case she is dragged into court—by your creditors.

"1st. The papers and notes referring to your transaction with Father are all intact and Ma has not examined them. She knows all about them, however.

"2nd. The assignment you sent me has not arrived. However, it was made after Father's death—and is probably illegal because without consideration and fraudulently intended to beat creditors.

"3rd. I do not know what your indebtedness to the estate is—but it must be increased to cover any contingency from your creditors. Hence—make out a note dated at the time Pa sold his steel stock—make it for six per cent and $5000.

"Make it a judgment note of short enough time so that it is due and payable now. This note I will put among Pa's papers and will testify, if called upon, that I found it there.

"I think the steel stock was sold about a year ago last November. You can save this letter which will protect you from the use of this note for any other purpose than that intended by this plan.

"4th. Make another assignment of your interest in this estate to Mother and myself—giving as consideration the notes against you—stating that they exceed your share of the estate—that the assignment is in satisfaction of the indebtedness and to facilitate in the estate settlement. Have a lawyer supervise drawing the papers.

"I can protect anything that may be coming to you in this way and this only and mother will know nothing of this note and I will —— it was among the papers should creditors step in. I hope to settle matters out of court, but can't say surely for the life insurance is made payable to his executors, administrators or assigns.

"Please act promptly in these matters for some one may jump in an yank us into court and I wont be ready. And I have a business which is running without a manager at $100.00 a day and I cant stay here over 10 days and must

be ready to act as soon as this assignment gets back. Wire me, my expense, as soon as you sent it with note.

"Sincerely your Bro

"HARRY."

It is alleged that, by the terms of this writing, Harry Y. Saint and Hannah Y. Saint were constituted trustees of the interest of Otto R. Saint subsequently assigned to them. No confidential relations are anywhere in the complaint alleged to have existed as between Otto R. Saint and Hannah Y. Saint, although such relation is alleged to have existed between Otto R. Saint and Harry Y. Saint.

At the death of William M. Saint, Otto R. Saint owed his father approximately $9,600, evidenced by a promissory note payable to William M. Saint. In reliance upon the above letter from Harry Y. Saint to Otto R. Saint, and on December 29, 1904, Otto R. Saint assigned his interest in the estate of William M. Saint to Harry Y. Saint and Hannah Y. Saint, in consideration of Otto R. Saint's indebtedness to said estate; Otto also executed and delivered his post-dated promissory note in the sum of $10,137.35 payable to William M. Saint.

The complaint further alleges:

"The plaintiff avers that though said note and deed of assignment recite a consideration, yet in truth and in fact such note for ten thousand one hundred thirty-seven and 50/100 ($10,137.50) dollars, was made and delivered without any consideration therefor, and no money was paid or intended to be paid as a consideration for said note; and plaintiff further says that though said deed of assignment likewise avers a consideration, yet in truth and in fact there was no consideration therefor, and no money was paid or intended to be paid, as a consideration for said assignment."

Hannah Y. Saint was legally appointed administrator of the estate of William M. Saint, and after the allowance of her final account, the above-mentioned real property was distributed in equal shares to Harry Y. Saint and Hannah Y. Saint on December 1, 1905, approximately one year subsequent to the date of Otto R. Saint's assignment. On December 15, 1906, Otto R. Saint advised Hannah Y. Saint of what he had done as to the note and assignment and demanded that she proceed to execute the alleged trust, whereupon Hannah Y. Saint wrote Otto R. Saint as follows:

"Dear Otto: Your letter of Jan. 17, came all right. I was astounded at some of its contents. No wonder there was so much misunderstanding about things. Harry surely done some very unwise things, that he may be sorry for sometime.

"I wrote him several times that you did not write to me, but he never answered anything about you. I never thought he was keeping you from writing. He rummaged among things and papers that he had no business to do. He took Pa's account book home with him. I tried to keep him from doing it,—he promised to send it back—he never done it. I have the receipts that Pa wrote and you and Harry signed. Yours is $3,888.70. Afterward is the same $3,888.70. Afterward he gave Harry some more, three different times, then summed it up amounting to $1,346.75. It is stated these monies are all gifts, to be no part of the estate. I saw in the account book once where he gave you $500.00 for a Christmas gift, and another where he gave you both fifty dollars for Christmas Gift. You will see by looking at the final account just what was to be divided between us. Harry got $5,666.76. I got the same. If I had known Harry had been doing some of the things you write about, he should have helped to pay some some of the things I have been paying out of my own pocket. I think I can get him to let you have your third of the realty I will try to get him to sign and instrument of writing stating he will agree that you shall have a third of the Real Estate,—when the time comes to sell it. . . .

"Kind regards to all,
"HANNAH Y. SAINT."

It is upon the strength of this last writing, and that alone, that it is alleged Hannah Y. Saint constituted herself trustee for the appellant Gertrude Saint, and frequently thereafter admitted to other persons that she held such property in trust for Otto R. Saint (not for the plaintiff).

It is further alleged: That Otto R. Saint's purpose in effecting this arrangement was to defraud his creditors; that his wife Gertrude Saint, appellant herein, had no knowledge of the arrangements to defraud his creditors or of the trust until June, 1928. On November 18, 1927, Hannah Y. Saint died, leaving a will, by the terms of which she devised to her son and daughter (Davis and Dubbs)

her interest in the aforesaid parcel of real property, which will was admitted to probate in July, 1928.

The demurrers interposed by the respondents were upon the grounds that the complaint did not state facts sufficient to constitute a cause of action; that there were defects in both parties plaintiff and defendant; that plaintiff's alleged cause of action was barred by sections 318, 337, 338 and 343 of the Code of Civil Procedure; that plaintiff's alleged cause of action was barred by laches; that the complaint purported to allege a trust created for an unlawful purpose, the enforcement of which would be contrary to public policy and hence void; and upon various grounds of ambiguity, unintelligibility and uncertainty, all of which are particularly set forth in the various demurrers.

Appellant first contends that the complaint states a cause of action upon a resulting trust. We are unable to agree with this contention. Section 853 of the Civil Code defines a resulting trust as follows: "When a transfer of real property is made to one person, and the consideration therefore is paid by or for another, a trust is presumed to result in favor of the person by or for whom such payment is made."

There are no allegations in the complaint, nor any set forth in the exhibits attached thereto, sufficient to establish a resulting trust in the property in question in favor of appellant. The facts alleged do not show that any consideration for the property, which is the subject of this litigation, was paid by or for appellant. She had absolutely no interest in the estate of William M. Saint, deceased. Therefore, the assignment made by her husband Otto R. Saint to his mother and brother could not be deemed to be a consideration moving from appellant to them for an interest in the estate of William M. Saint, deceased, which would in any way constitute a payment within the meaning of the statute. (*Parshall* v. *Parshall,* 56 Cal. App. 548 [205 Pac. 1081].) The exhibits attached to the complaint furnish no evidence whatever that appellant's husband made an assignment for the benefit of appellant, or intended it as a consideration for vesting a share of the estate of his father in her, nor is it alleged that he intended to do any such thing. What the complaint and the exhibits attached thereto really show is that Otto R. Saint, who was then in-

debted to his creditors to the extent of $30,000, transferred to his mother and brother his interest in his father's estate for the purpose and with the intent of putting whatever property he might inherit from his father's estate beyond the reach of his creditors. The respondent Harry Y. Saint was a party to this fraud.

No rule of law is more strictly adhered to than the rule that equity will not lend its aid to establish a trust or enforce a contract which is tainted with fraud. He who executes a conveyance of property for the purpose of hindering, delaying or defrauding his creditors, cannot by an action in equity obtain a reconveyance from his grantee, nor can anyone claiming under him, except an innocent purchaser. The authorities supporting this well-known rule are legion, and we need cite only the following: *Allstead* v. *Laumeister,* 16 Cal. App. 59 [116 Pac. 296]; *Anderson* v. *Nelson,* 83 Cal. App. 1–6 [256 Pac. 294, 296].

The facts set forth in the complaint and in the exhibits attached thereto do not bring the case within the exception to this general rule, which is this: "Where the parties are not *in pari delicto* and the deed, though made for an improper purpose, was unfairly procured through the undue influence of the grantee, the violation of a fiduciary relationship, abuse of confidence, oppression, or fraud, the court will grant relief." (*Anderson* v. *Nelson, supra.*)

It is readily apparent from an inspection of the record that the reason this action was brought in the name of Gertrude Saint, instead of Otto R. Saint, was because no action could possibly be maintained in the name of Otto R. Saint, because of the fraudulent nature of the original transaction. Even if it be conceded that the assignment was made for the benefit of appellant, it was, nevertheless, made for the fraudulent purpose of putting the property beyond the reach of her husband's creditors. She could no more assert title to the property than could he, regardless of whether or not she knew of the fraud. The original transaction, being fraudulent, remains tainted not only to the parties to the transaction, but as to all persons claiming under them, and to all persons who claim the benefit of the fraudulent transaction, except as to innocent purchasers for value.

 We think the allegations of the complaint conclusively demonstrate that appellant and her predecessor in interest, her husband, Otto R. Saint, are guilty of such laches as well preclude a court of equity at this late date from granting any relief whatever—twenty-four years have passed and gone since the creation of the alleged trust. The fact that appellant is alleged to have no knowledge thereof until 1928 is not sufficient. She is claiming through her husband and the staleness of his assertions and the repudiations made to him are imputed to her.

In *Miller* v. *Ash*, 156 Cal. 545 [105 Pac. 600, 606], the Supreme Court said:

"Nothing can call a court of. chancery into activity but conscience, good faith and reasonable diligence, and where these are wanting the court is passive, and does nothing. . . . Where the aid of the courts is asked after the lapse of many years, the fact that such aid is demanded for the first time after the death of the party charged with default when explanation from his own lips is impossible, furnishes the foundation for a forceful and sometimes persuasive argument (that the action is barred). The defense of laches is, of course, as legitimate and impregnable a defense as may be set up, when urged under appropriate circumstances, and should unhesitatingly be sustained where it clearly appears that the party has, through his own supineness or listlessness, and not through any act or fraud of the party against whom the right subsists, neglects for so long to prosecute his right as to indicate an abandonment thereof."

Also, in *Earhart* v. *Churchill*, 169 Cal. 728 [147 Pac. 942, 944], the court said:

"Equity will not countenance stale claims, and after the lapse of so long a time (14 years) will strictly scrutinize such bill as this and will send appellants out of court unless they make a most meritorious showing of their right to assistance." (See *Ackley* v. *Bassett*, 189 Cal. 625 [109 Pac. 576].)

 Appellants also contend that the trial court abused its discretion in denying her the right to amend. The record does not show in what manner appellant desired to amend—what changes or additions she proposed to make in the complaint. There is nothing in the record to indicate that she specified in the trial court the nature of the

proposed amendment or amendments. Under these circumstances, we cannot say the court abused its discretion in denying her the right to amend. (*Kleinclaus* v. *Dutard,* 147 Cal. 245 [81 Pac. 516]; *Dukes* v. *Kellogg,* 127 Cal. 563 [60 Pac. 44]; *Burling* v. *Newlands,* 112 Cal. 476 [44 Pac. 810]; *Hansen* v. *Carr,* 73 Cal. App. 518 [238 Pac. 1048]; *Murphy* v. *Murphy,* 57· Cal. App. 182 [207 Pac. 43]; · *Whyte* v. *City of Sacramento,* 65 Cal. App. 534 [224 Pac. 1008]; *Bailey Trading Co.* v. *Levy,* 72 Cal. App. 339 [237· Pac. 408]; *Lapique* v. *Walsh,* 50 Cal. App. 86 [195 Pac. 296]; *Farber* v. *Greenberg,* 98 Cal. App. 675 [277 Pac. 534].)

Indeed, we are unable to perceive, if the facts alleged in the complaint are true, how appellant can mend her complaint to state a cause of action against respondents at this late date, either upon the theory of an express or a resulting trust.

We deem a discussion of the other contentions made both by appellant and respondents entirely unnecessary.

The judgment appealed from should be affirmed, and it is so ordered.

Plummer, J., and Thompson (R. L.), J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on February 18, 1932, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 17, 1932.