[S. F. No. 22616.   In Bank.   Mar. 20, 1969.]

WALTER S. COOPER, Plaintiff and Appellant, v. LESLIE
SALT COMPANY et al., Defendants and Respondents.

[S. F. No. 22617.   In Bank.   Mar. 20, 1969.]

WALTER S. COOPER, Plaintiff and Appellant, v. T. JACK
FOSTER et al., Defendants and Respondents.

(Consolidated Appeals.)

Funsten & Caldwell and James W. Funsten for Plaintiffs and Appellants.

Chickering & Gregory, W. Burleigh Pattee, William E. Trautman, Long & Levit, Bert W. Levit, Gerald Z. Marer, Victor B. Levit, Wilson, Jones, Morton & Lynch and John E. Lynch for Defendants and Respondents.

BURKE, J.—In this controversy over the establishment and operation of a special improvement district, a hearing was granted by this court, after decision by the Court of Appeal, First Appellate District, Division Four, for the purpose of giving further study to the problems presented. After such study we have concluded that the opinion of the Court of Appeal, prepared by Justice Christian, correctly treats and disposes of the issues involved, and with certain further comments pertinent to contentions urged, it is adopted as and for the opinion of this court. Such opinion (with appropriate deletions and additions as indicated) is as follows:[1]

Plaintiff Walter S. Cooper appeals from judgments of dismissal[2] which followed the sustaining of general demurrers without leave to amend in an action attacking the manner in which respondents have caused municipal improvements and

---

[1]Brackets together, in this manner [], are used to indicate deletions from the opinion of the Court of Appeal; brackets enclosing material (other than editor's added parallel citations) are, unless otherwise indicated, used to denote insertions or additions by this court. We thus avoid the extension of quotation marks within quotation marks which would be incident to the use of such conventional punctuation, and at the same time accurately indicate the matter quoted. (*Simmons* v. *Civil Service Emp. Ins. Co.* (1962) 57 Cal.2d 381, 383, fn. 1 [19 Cal.Rptr. 662, 369 P.2d 262]; *Eye Dog Foundation* v. *State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 540, fn. 1 [63 Cal.Rptr. 21, 432 P.2d 717]; *Smith* v. *Anderson* (1967) 67 Cal.2d 635, 637, fn. 1 [63 Cal.Rptr. 391, 433 P.2d 183]; *McDonnell Douglas Corp.* v. *Franchise Tax Board* (1968) 69 Cal.2d 506, 508, fn. 1 [72 Cal.Rptr. 465, 446 P.2d 313].)

[2]Two judgments were entered on separate dates as to two groups of defendants. Plaintiff appeals from both judgments; the issues are identical and the appeals have been consolidated.

services to be financed by the Estero Municipal Improvement District. of which appellant is a taxpayer.

The district was established by special act [Estero Act] of the Legislature. (Stats. 1961, First Ex. Sess. 1960, ch. 82, p. 459.) The act prescribed the boundaries, organization and powers of the district, as well as methods for its operation, management, financing, change of boundaries, and dissolution. Provision is made in section 121 of the act for an in rem proceeding to establish the validity of "the creation of the district and any annexations thereto" or to determine its right to issue bonds.

A judgment purporting to establish the constitutionality of the act creating the district and the validity of the district's bonds was rendered in an uncontested in rem proceeding in the Superior Court of San Mateo County on July 20, 1961.

The statute recited that "The land in the district is not owned by residents. The owners are the ones primarily concerned with the district and the ones who will be supporting the district. The owners should therefore hold the voting power." (§ 215, subd. (f).) Thus it was provided that voting was to be upon the basis of assessed valuation of land [　] [§§ 17, 19, 20, 64], and that the district was to be governed by three directors (§ 26) who must be "owners, or officers or legal representatives of owners" (§ 28). The statute places a broad array of municipal functions within the powers of the district, including provision of street lighting, sewerage, storm drainage, garbage service, water service, parks and playgrounds, and reclamation of [　] land (§ 77). The district is also empowered to construct small craft harbors (§ 78), provide fire protection (§ 79), and "make and enforce all necessary and proper regulations, not in conflict with the laws of this State, for the . . . supplying of . . . police protection service. A violation of a regulation of the district is a misdemeanor punishable as such." (§ 97.) The statute includes elaborate financial provisions, including authorization for the directors to issue general obligation bonds (§§ 105-123) and other types of securities to raise money for development of the raw land included within the district so that the owners thereof, who absolutely control the operations of the district,[3] can cause the various improvements to be made

<hr />

[3]After the dismissal of this action the act was amended [§§ 26, 28], to enlarge the board of directors to five members, of which two represent landowners, two represent residents, and one is a "public member" appointed by the county board of supervisors. After 1969, the "public

which are necessary to make the land fit for marketing as a residential tract. (See Willoughby, *The Quiet Alliance*, (1965) 38 So.Cal.L.Rev. 72, for a review of several comparable special statutes under which governmental powers have been made serviceable to land developers.)

Appellant's complaint, alleging four causes of action upon various theories, was amended twice before a general demurrer was sustained without leave to amend. Because the four causes of action contain overlapping allegations, and the dismissal was upon a general rather than a special demurrer, we shall analyze as a whole all of the factual allegations of the complaint to determine (1) whether any cause of action was stated, and (2) whether the trial court committed an abuse of discretion in cutting off further amendment.

There is no allegation that the formation and operation of the district failed to conform to the provisions of the Estero Act; rather it is charged that the act itself is void in that it purports to create a corporation for municipal purposes by special act of the Legislature in violation of article XI, section 6, of the California Constitution.[4]

Respondents contend that Code of Civil Procedure section 803 precludes appellant from contesting the validity of proceedings leading to the formation of the district. Section 803 provides:

"An action may be brought by the attorney-general, in the name of the people of this state, upon his own information, or upon a complaint of a private party, against any person who usurps, intrudes into, or unlawfully holds or exercises any public office, civil or military, or any franchise, or against any corporation, either de jure or de facto, which usurps, intrudes into, or unlawfully holds or exercises any franchise, within this state. And the attorney general must bring the action, whenever he has reason to believe that any such office or franchise has been usurped, intruded into, or unlawfully held or exercised by any person, or when he is directed to do so by the governor."

In *San Ysidro Irr. Dist.* v. *Superior Court* (1961) 56 Cal.2d 708 [16 Cal.Rptr. 609, 365 P.2d 753], [   ] [this] court held

member'' will also be elected by the residents of the district, [and after 1971 the two directors now representing landowners will likewise be elected by the residents]. (Stats. 1967, ch. 1511, §§ 3, 5.)

[4] Article XI, section 6: ''Corporations for municipal purposes shall not be created by special laws; but the Legislature shall, by general laws, provide for the incorporation, organization, and classification, in proportion to population, of cities and towns, . . .''

that, absent constitutional or statutory regulations providing otherwise, quo warranto is the only proper remedy in cases in which it is available. Therefore, it is the exclusive remedy for testing the legality of the existence of an irrigation district. As those districts are delegated agencies of the state government their existence should not be subject to attack at the caprice of private interests, but should be open to question only in a direct proceeding controlled by an officer charged with protecting the public interest. The court therefore held that the superior court would not have jurisdiction of an action challenging the lawful existence of a special district unless brought by the Attorney General.

In *City of San Diego* v. *Otay Municipal Water Dist.* (1962) 200 Cal.App.2d 672 [19 Cal.Rptr. 595], the city brought an action to enjoin the [ ] [furnishing of water to inhabitants of an improvement district]. Three landowners intervened seeking a determination of the validity of proceedings resulting in the formation of the district. The court held [p. 681] that the interveners had no authority to bring the action to annul the existence of the district on the grounds that it was invalidly formed or that the statute under which it was formed was unconstitutional. Such a remedy is not available to a taxpayer; it is within the exclusive province of the Attorney General through a quo warranto action. (Accord *Wilson* v. *City of San Bernardino* (1960) 186 Cal.App.2d 603 [9 Cal. Rptr. 431]; 41 Cal.Jur.2d, Quo Warranto, § 5, p. 614; 74 C.J.S., Quo Warranto, § 5, p. 183; 74 C.J.S., Quo Warranto, § 4, 179-181.)

Appellant contends that quo warranto is not the exclusive remedy here because the Estero district is neither de facto nor de jure a corporation, citing *Brandenstein* v. *Hoke* (1894) 101 Cal. 131 [35 P. 562]. There the court found patently unconstitutional, a statute under which a levee district was formed [and denied recovery to plaintiff bondholder who sought to compel defendant board of supervisors to levy and collect a tax to pay the bonds]. The court considered that because there was no valid statute under which the purported corporation could have been created, no de facto corporation could exist. But later cases have held that without regard to the claimed unconstitutionality of any statute, it is only where proceedings to create a district have not been fully completed that a private citizen can question their validity. (*Alden* v. *Superior Court* (1963) 212 Cal.App.2d 764, 769-770 [28 Cal.Rptr. 387]; *City of Colton* v. *City of Rialto* (1964) 230 Cal.App.2d 174

[40 Cal.Rptr. 766]; *Hazelton* v. *City of San Diego* (1960) 183 Cal.App.2d 131, [135] [6 Cal.Rptr. 723]; [see also *Yorty* v. *Anderson* (1963) 60 Cal.2d 312, 316 [33 Cal.Rptr. 97, 384 P.2d 417]].) ■ The following elements are prerequiste to de facto corporate status: (1) there must be a charter or general law under which a corporation may be formed; (2) there must be a good faith attempted compliance with the statute; (3) there must be a colorable compliance with the statutory requirements; and (4) there must be an assumption of the corporate powers. (1 McQuillan, Municipal Corporations, § 3.48; *City of Colton* v. *City of Rialto, supra,* 230 Cal.App.2d 174, 182.) ■ There is no allegation that the Estero District has not satisfied all these requirements; thus it would at least be a corporation de facto. ■ Moreover, since the act is not patently unconstitutional, the rule of *Brandenstein* v. *Hoke, supra,* does not apply. Once the district's existence is established, either de facto or de jure, it follows that a private person may not contest the validity of proceedings leading to its formation. (*Hazelton* v. *City of San Diego, supra,* 183 Cal.App.2d 131, 135.) ■ In the present case the prior validation judgment declared that the district was validly created. [ ] [The district's existence is thus not subject to the attack here attempted.]

■ Appellant advances a subsidiary contention that he ought to be allowed to attack the constitutionality of the Estero Act because, in one of the causes of action, he seeks a judicial declaration that the statute is unconstitutional. But in *San Ysidro Irr. Dist.* v. *Superior Court, supra,* 56 Cal.2d 708, 715, it was held that because the declaratory judgment law was not designed to undermine the policy of the quo warranto statute, the existence of municipal corporations is not open to attack by private individuals. "The existing authorities in California support the view that declaratory relief would not be available to a party in these circumstances which could not maintain a quo warranto action in its own name." (56 Cal.2d at p. 715.)

The complaint alleges that $30,000,000 of the district's funds was "spent to improve and make saleable the real property of [the Foster defendants] under the claim that said expenditure is authorized as reclamation. . . ." In his capacity as a district taxpayer appellant prayed for a judgment requiring restoration of that amount to the district. ■ Appellant contends here that the district is not empowered to fill dry land. It is true that section 77 of the act, authorizing

reclamation of "submerged or other land" speaks of "watering or dewatering" and does not specifically mention filling. It is also true that section 78, which authorizes reclamation by grading, excavation and filling, refers only to "small craft harbor purposes." Appellant seems to contend that filling of an area described only as "dry private land" could never come within the scope of "watering or dewatering." The language of the statute does not suggest that conclusion; it is conceivable that land not actually submerged might be in need of reclamation by means of "watering or dewatering." The reclamation of private lands which are not all swamp and overflowed lands may be a valid public purpose. (*Islais Creek Rec. Dist.* v. *All Persons* (1927) 200 Cal. 277, 283 [252 P. 1043].) ▇ Moreover, the complaint alleges that the work done was not reclamation at all because it was "for [other] improvement of dry private land of said defendants." That language is so broad as to bring into play the whole array of services mentioned in section 77 (e.g., sewerage, storm drainage, and "distribution of water for public and private purposes") which may be proper functions of a governmental entity even though private property is incidentally benefited. Appellant has never alleged any specific manner in which public monies of the district have been applied to private purposes. The allegations we have reviewed go no further than to hint at a general subject matter as to which plaintiff feels aggrieved; if all those allegations were accepted as true the court would have been unable to determine whether plaintiff was entitled to any recovery whatever in behalf of the district. The general demurrer was therefore correctly sustained as to the attempt to allege a taxpayer's cause of action.

▇ The complaint then sets forth miscellaneous general allegations hinting at sinister activities on the part of certain of the respondents:

(a) It is alleged that the Foster respondents "have secured for themselves the power to control and administer the bookkeeping of said district for a compensation. . . ."

(b) It is alleged that the Foster respondents have, by virtue of their control and domination of the district, "obtained great private monetary advantage. . . ."

(c) It is alleged that Innes, a Foster employee and a director of the district, caused the Associated Dredging Company to submit statements to the district pursuant to which [ ] [22] district checks totaling $860,218.05 were issued and delivered to Associated with the understanding that they would be

indorsed to respondent Midwest Dredging Corporation, a Foster subsidiary. It is alleged that Midwest received a further $1,667,183.80 upon claims it presented directly to the district.

None of these recitals states a cause of action. There is no allegation that there was anything unlawful about the manner of contracting for bookkeeping services for the district; neither is any showing of illegality alleged with regard to the payments to Associated Dredging and Midwest Dredging.

It is possible that appellant intended to allege fraudulent misappropriations of district funds, but fraud is never presumed—facts constituting fraud must be specifically pleaded. (*Gautier* v. *General Tel. Co.* (1965) 234 Cal.App.2d 302, 308 [44 Cal.Rptr. 404].) The court must be able to determine from the complaint that a prima facie case is alleged. (2 Chadbourne, Grossman, Van Alstyne, California Pleading, § 982.) Here the complaint neglects to set forth any specific facts which would establish that Innes acted fraudulently. For example, appellant does not allege that the work was poorly done or not done at all. He does not allege facts to show that the $860,218.05 was a higher amount than a contract called for. Appellant does not allege that there was anything fraudulent about the endorsement of the checks by Associated to the Foster subsidiary. Possibly the two firms were joint venturers in the reclamation work.

Generally it is an abuse of discretion to sustain a demurrer without leave to amend if there is any reasonable possibility that the defect can be cured by amendment. (*Temescal Water Co.* v. *Department of Public Works* (1955) 44 Cal.2d 90, 107 [280 P.2d 1].) If one count of a complaint does state a cause of action, it is an abuse of discretion to sustain the demurrer as to that count. (*Western Title Ins. etc. Co.* v. *Bartolacelli* (1954) 124 Cal.App.2d 690, 694 [269 P.2d 165].) However, the burden is on the plaintiff to demonstrate that the trial court abused its discretion. (*Filice* v. *Boccardo* (1962) 210 Cal.App.2d 843, 847 [26 Cal.Rptr. 789]; *Starbird* v. *Lane* (1962) 203 Cal.App.2d 247, 262 [21 Cal.Rptr. 280]; *Schultz* v. *Steinberg* (1960) 182 Cal.App.2d 134, 140 [5 Cal.Rptr. 890].) Plaintiff must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading. (*Saint* v. *Saint* (1932) 120 Cal.App. 15, 23-24 [7 P.2d 374].) Here appellant has never advanced, either in the trial court or before us, any effective allegation which he could now make if further amendment to the complaint were to be permitted. Although

he insinuates multiple wrongs by respondents, he never points out in what manner those insinuations could be combined to state a cause of action. (See *Schultz* v. *Steinberg, supra,* at p. 141.)

■ Appellant also contends that reversal is required by the recent holding of the United States Supreme Court in *Avery* v. *Midland County* (1968) 390 U.S. 474 [20 L.Ed.2d 45, 88 S.Ct. 1114] that equal protection demands equal apportionment of constituencies in units of local government having general governmental powers. The complaint did make some attempt to raise issues regarding district elections. It alleged: "Said act and the purported district are in conflict with the Constitution of the United States of America in that, among other things, the power to vote in said district is divided according to assessed valuation rather than equally among persons." [ ] [However, even if it be assumed without deciding that defendant district exercises general governmental powers within the purview of *Avery* (see also *Thompson* v. *Board of Directors* (1967) 247 Cal.App. 2d 587, 590-592 [55 Cal.Rptr. 689]), the Legislature has already made provision for transfer of control from the owners to the residents. As stated (*ante,* fn. 3), by amendment of the Estero Act (Stats. 1967, ch. 1511) the governing board was increased to five members commencing in December 1967 (§ 26), two of whom are required to be and to be elected by registered voters resident within the district (§ 28). After December 1969 the member now appointed by the county board of supervisors will also be elected by resident registered voters, and after December 1971 the offices of the present two landowner-directors will similarly be filled by vote of residents. (§ 28.)

[It appears that at the time the district was created by the Legislature in 1960 it comprised some 418 uninhabited acres under a single ownership, that thereafter it annexed adjacent territory (§ 205) so that it now totals some 2,600 acres, and that as improvement and development have proceeded the district has acquired residents. The statute declares the desirability that upon creation of the district the owners hold the voting power, as they were the persons primarily concerned with the district and who would be supporting it. (§ 215.)[5]

[5]Section 215 of the statute further declares, among other things, the purpose of enabling improvement of the area; that the area was without sewage facilities, adequate water supply, or small craft harbor facilities, all of which it urgently needed; that the area is of strategic importance during times of war or threatened war, and that influx of military men

However, the Legislature has recognized that as the character of the district gradually changes from uninhabited to that of an area with substantial numbers of resident registered voters it is appropriate that voting power likewise gradually shift. Since the transfer of control from owners to resident voters will be completely accomplished by the close of 1971, no occasion is shown for interference by this court with the programming spelled out by the Legislature. (See *Silver* v. *Brown* (1965) 63 Cal.2d 270, 274-275 [46 Cal.Rptr. 308, 405 P.2d 132]; *Miller* v. *Board of Supervisors* (1965) 63 Cal.2d 343 [46 Cal.Rptr. 617, 405 P.2d 857].)]

      At oral argument [before the Court of Appeal, when this cause was pending before that court] appellant moved, pursuant to rule 23, subdivision (b), California Rules of Court, for an "Order Directing Taking of Evidence on Appeal" to assist [ ] [the] court in determining whether the superior court correctly ordered the amended complaint dismissed as sham[6] and "whether there are additional facts not referred to in the complaint herein, which are within the subject matter of the complaint and as to which appellants should be allowed an opportunity to plead." We do not consider it a function of an order under rule 23, subdivision (b), to afford a party the facilities of the appellate court for exploratory investigation to try to develop facts sufficient to enable him to state a cause of action.

The judgments are affirmed; the motion to take evidence is denied.

Traynor, C. J., McComb, J., and Tobriner, J., concurred.

MOSK, J.—I concur in part and dissent in part.

On the basis of the complaints in these proceedings and in the companion case, there arise suspicions that all is not well with the management of the Estero community. But suspicions, however strong, are inadequate for pleading purposes. Thus I concur in much of the majority opinion.

Many of the problems giving rise to plaintiff's dissatisfac-

---

and their families during such times greatly increases the necessity of providing facilities.]

[6]The Foster respondents and some of the other respondents moved to strike the complaint as amended, on the ground that it was "sham, vexatious, scandalous, abusive, disrespectful, frivolous," etc. The order granting the motion to strike was concurrent with the order sustaining the demurrer. The judgment of dismissal is adequately supported by the ruling upon the demurrer; therefore we have not considered the propriety of the motion to strike.

tion would dissolve if the people of the district had been, as everyone should be in a democratic society, the masters of their own destiny. Here the effective political and economic power rests not with the residents of the district, but with a regency. Like a vicarious government during a monarch's childhood, this district is ruled as if the people required protective guidance during their minority. However tolerable in another milieu, such paternalism is undesirable and invalid in this year 1969.

Therefore I dissent from that portion of the majority opinion which holds that because "the transfer of control from owners to resident voters will be completely accomplished by 1971 no occasion is shown for interference by this court with the programming spelled out by the Legislature."

In my view, the Estero Act, as it presently exists, unquestionably violates the precepts laid down in *Avery* v. *Midland County* (1968) 390 U.S. 474 [20 L.Ed.2d 45, 88 S.Ct. 1114], and the majority's holding that compliance with those constitutional principles may be deferred until a future date cannot be justified. I would hold that the Supreme Court oneman, one-vote command is not satisfied by the one-man, three-fifths-of-a-vote practice now prevailing in the Estero community. (Maj. Opn. fn. 3.)

In *Avery* the Supreme Court held that the one-man one-vote principle enunciated in *Reynolds* v. *Sims* (1964) 377 U.S. 533 [12 L.Ed.2d 506, 84 S.Ct. 1362], is applicable to districts of local government and that the Constitution permits no substantial variation from equal population in establishing units of local agencies having general governmental powers. The Midland County Commissioners Court, the elective body involved in *Avery,* was empowered to establish a courthouse and jail, appoint numerous minor officials, fill vacancies in the county offices, let contracts in the name of the county, build roads and bridges, administer the county's public welfare services, perform numerous duties in regard to elections, set the county tax rate, issue bonds, adopt a budget, serve as a board of equalization, and build and operate various public facilities.

The local governing body in *Avery* had the "power to make a large number of decisions having a broad range of impacts on all the citizens of the county" and to make "long-term judgments" affecting the future development and the present needs of the county. The opinion states, "Were the Commissioners Court a special purpose unit of

government assigned the performance of functions affecting definable groups of constituents more than other constituents, we would have to confront the question whether such bodies may be apportioned in ways which give greater influence to the citizens most affected by the organizations' functions. That question, however, is not presented by this case, for . . . . the relevant fact is that the powers of the Commissioners Court include the authority to make a substantial number of decisions that affect all citizens'' of the county. Similarly, in *Pierce* v. *Village of Ossining* (S.D.N.Y. 1968) 292 F.Supp. 113, a statute limiting the right to vote in local elections to property owners was held to constitute a denial of equal protection of the laws.

In California we have applied the one-man, one-vote principle of *Reynolds* v. *Sims* (1964) *supra,* 377 U.S. 533, to elections for county boards of supervisors which serve local legislative and administrative functions. (*Miller* v. *Board of Supervisors* (1965) 63 Cal.2d 343, 348 [46 Cal.Rptr. 617, 405 P.2d 857].)

While the present case does not involve the problem of malapportionment of elective districts but discrimination between voters who own and those who do not own real property within the district, as well as between small and large landowners, it is inescapable from the holding of *Avery* that if the district's board may exercise general governmental powers over the residents of the district, the voters therein must be accorded equal voting rights on a one-man, one-vote basis, without regard to whether or not they own property within the district or the amount thereof. (See *Thompson* v. *Board of Directors* (1967) 247 Cal.App.2d 587, 590-592 [55 Cal.Rptr. 689].)

An analysis of the terms of the Estero Act establishes that the district is not a ''special purpose unit of government assigned the performance of functions affecting definable groups of constituents more than other constituents.'' Indeed it is difficult to contemplate a broader spectrum of general governmental functions than those bestowed upon the Estero community.The district is empowered to acquire, construct and maintain facilities for street lighting, collection and disposal of sewage, production and distribution of water, parks, playgrounds and drainage works, and may reclaim submerged or other land by watering or dewatering (Estero Act, § 77). It may acquire or construct a private small craft harbor and utilities useful to its operation (§ 78). It may also operate

and equip fire and police departments (§ 79), construct gas. telephone and electrical facilities (§ 79a), hold or dispose of property within or without the district (§ 80), and exercise the right of eminent domain for the condemnation of private property for public use in the same manner as the legislative body of a city (§ 81). It may make such contracts as appear necessary or proper (§ 83) and make and enforce regulations necessary to the exercise of the functions given it by the act. A violation of these regulations constitutes a misdemeanor (§ 97).

The governing board has very broad financial powers. It may borrow money (§ 85), issue general obligation bonds (§ 105 et seq.) and revenue bonds (§ 135), and cause special assessments to be levied and issue bonds to represent unpaid assessments (§ 93). Taxes to pay the principal and interest on the bonds and to defray expenses incidental to the district's powers are levied, under the act, on the real and personal property in the district (§ 160 et seq.).

This comprehensive range of authority is in some respects more embracive than that accorded the Commissioners Court in *Avery* and most, if not all, of the powers affect all residents of the district alike, without regard to the amount, if any, of real property they own in the district. Under these circumstances there seems little doubt that plaintiff and other residents of the district are deprived of equal protection of the laws by the requirement that a certain number of members of the governing board be elected only by landowners and that voting power among landowners should be divided according to assessed valuation. As stated in *Harper* v. *Virginia Board of Elections* (1965) 383 U.S. 663, 666 [16 L.Ed.2d 169, 172, 88 S.Ct. 1079]: ''. . . a State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter . . . an electoral standard. Voter qualifications have no relation to wealth. . . .''

The majority holds that even if present methods of voting are of dubious validity, the Legislature has provided for the gradual transfer of control of the district to the residents by elections to be held in November 1971, and we are not justified in tampering with this scheme.[1] The only authority cited for

---

[1]This is somewhat reminiscent of the noblesse oblige evidenced by the court in *People* v. *Sacramento Drainage Dist.* (1909) 155 Cal. 373 [103 P. 207], when it approved creation of a governmental agency to carry out a single purpose, and said (at p. 382): ''It is in accord with the progressive spirit of our government to give to the people, or any part of them, the largest possible control in matters peculiarly affecting them

this proposition is *Silver* v. *Brown* (1965) 63 Cal.2d 270, 274-275 [46 Cal.Rptr. 308, 405 P.2d 132], and *Miller* v. *Board of Supervisors* (1965) 63 Cal.2d 343, 350 [46 Cal.Rptr. 617, 405 P.2d 857]. Both these cases, decided in September 1965, not only fail to support the majority's holding but they teach us that dilatoriness and deferred reapportionment plans are unacceptable. In *Silver* we held that although the California Senate and Assembly should be accorded an opportunity to reapportion themselves since they had previously failed to agree upon a plan and since a delay until the next regular session was not justified, this court would itself promulgate a reapportionment plan for the forthcoming election unless a special session of the Legislature passed a constitutionally adequate reapportionment plan in time for that election. In *Miller* we ordered invalidly apportioned supervisorial districts to be reapportioned by the Board of Supervisors of Santa Clara County within 90 days so that the next election would be based upon the newly apportioned districts. In neither *Silver* nor *Miller* would this court tolerate procrastination; in both instances we insisted upon one man, one vote at the immediately forthcoming election, although the factors involved in reapportionment were complicated and politically volatile. Moreover, in *Silver* respondents urged cogent reasons for delaying reapportionment, i.e., that compliance with certain provisions of the Elections Code was difficult because of the time factors involved, but we resolutely held nevertheless that a delay was not justified. Finally, in both *Silver* and *Miller* no constitutional reapportionment plans were then in existence, and this court, although reluctant to undertake formulation of a program, was willing to do so if necessary to preserve the constitutional rights of the voters at the next election.

Here we are presented with a much stronger case for immediate implementation of the voting rights of citizens than in either *Silver* or *Miller,* for, by contrast, no new reapportionment plan need be designed. The Legislature itself has passed a complete scheme to effectuate the voting rights of the district's residents down to the details regarding the manner in which both regular and special elections should be conducted, but has provided that the statute, passed in 1967, should not be fully implemented until the elections to be held in Novem-

and their interests. It is a concession to this spirit, and not the compulsion of the law, which prompts the legislature to give the landowners so large a voice in the management of these affairs.''

ber 1971. (Stats. 1967, ch. 1511.) There are no complicated policy questions here relating to whether the Legislature should be given an initial opportunity to carry out the constitutional mandate before this court acts. The only reason advanced by the majority for holding that the district's residents are not entitled to an equal vote until 1971 is that there were no residents in the district when it was originally formed and that the Legislature has made a determination that when substantial numbers of voters move into the district *the voting power should gradually shift to the residents.*

The flaw in the program, unanswered by the majority, is the lack of justification for waiting until November 1971, if there are a substantial number of resident voters long before that date. The uncontroverted fact is that there are now more than 8,000 persons residing in the district and the steady influx indicates there will be many more prior to the time an election is held in November 1971. No one can deny that there are a substantial number of registered voters among the residents. It seems hardly necessary to note parenthetically that if the legislative bodies involved in the *Silver* and *Miller* cases had passed valid reapportionment measures but had delayed their effectiveness for four years because it was their judgment that the equal voting rights of citizens should be implemented gradually, this court would not have countenanced such a dilatory arrangement.

Indeed, a recent case involved just that situation. In *Petuskey* v. *Rampton* (1965) 243 F.Supp. 365, 369-374, the Utah Legislature was reapportioned by an act, passed in 1965, but not to be effective until 1969. The court held this provision to be in violation of the federal Constitution and ordered that the reapportionment become effective at the next election at which it was mechanically possible to put the plan into operation.

*Silver* and *Miller* are not the only cases which have recognized the urgency of prompt action in order to assure that voters are not deprived of their rights one day longer than necessary. *Reynolds* v. *Sims* (1964) *supra,* 377 U.S. 533, states (at p. 585 [12 L.Ed.2d at p. 541]) that ". . . once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan."[2] A number of commentators have also emphasized the

[2]This injunction is qualified by the further statement that "in award-

necessity for promptness because "every day that a legislature elected under an invalidated system is allowed to sit results in the perpetuation of the wrong for which a remedy is sought." (*The Case for District Court Management of the Reapportionment Process*, 114 U.Pa.L.Rev. 504, 510; McKay, Reapportionment (1965) 161-162.) Many courts have taken heroic measures in order to avoid an undue postponement of relief. For example, state constitutional measures setting forth "time lock" provisions have been bypassed (*Buckley* v. *Hoff* (D.Vt. 1964) 234 F.Supp. 191, 198), deadlines have been set, such as those in *Silver* and *Miller,* and even where practical considerations have called for permitting elections to be conducted on the basis of invalidly apportioned districts some courts have reduced the terms of the representatives elected under the unconstitutional system. (*Hughes* v. *WMCA, Inc.* (1965) 379 U.S. 694, 695 [13 L.Ed.2d 698, 699, 85 S.Ct. 713]; for a summary of some remedial measures adopted by the courts see *The Case for District Court Management of the Reapportionment Process, supra,* 114 U.Pa.L.Rev. 504.)

In the present case no obstacles to the immediate conduct of elections on a one-man, one-vote basis exist, and only the statutory postponement of the exercise of those rights until 1971 impedes implementation. This action was filed in 1966, before the Legislature had made any provisions for elected representation of nonlandowners on the board. Three years have elapsed since that time and almost three more years will pass before the composition of the board complies with constitutional mandates. To wholly or partially deprive more than 8,000 residents of their constitutional right to an equal vote is unjust. That the injustice is to be cured in the future makes it no less unjust today.

Peters, J., and Sullivan, J., concurred.

Appellant's petition for a rehearing was denied April 17, 1969, and the opinion was modified to read as printed above. Peters, J., Mosk, J., and Sullivan, J., were of the opinion that the petition should be granted.

---

ing or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws" and that "a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree." (377 U.S. at p. 585 [12 L.Ed.2d at p. 541].) No claim is made that any of the foregoing factors justifying a delay are present here.