Filed 3/25/16  Nidiver v. Lifehouse Health Services CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| BONNIE NIDIVER et al., | C077803 |
| Plaintiffs and Appellants, | (Super. Ct. No. 156431) |
| v. | |
| LIFEHOUSE HEALTH SERVICES, LLC, | |
| Defendant and Respondent. | |

In this elder abuse case, plaintiffs Bonnie and Scott Nidiver contend the trial court erred in sustaining the demurrer of defendant Lifehouse Health Services, LLC, without leave to amend.  We disagree and therefore affirm.

FACTUAL AND PROCEDURAL BACKGROUND

We take the following facts from the third amended complaint:

Cypress Healthcare Center (Cypress) is a skilled nursing facility in Paradise, California.  Defendant Lifehouse Cypress Operations, LLC, (Cypress Operations) is the licensee for Cypress.  Cypress Operations was formed by and is wholly owned by

1

defendant Lifehouse Health Services, LLC, (Lifehouse), i.e., Lifehouse is the sole member of Cypress Operations.

Eugene Nidiver was admitted to Cypress for rehabilitation on April 6, 2011. He was 87 years old at the time. Between April 7 and May 24, the nursing staff at Cypress violated the orders of Eugene's physician and his plan of care on numerous occasions by failing to administer prescribed medication, failing to properly assess his condition, and failing to take precautions against a possible fall. On the morning of May 24, Eugene was in his wheelchair in the main lobby of the facility. Eventually he stood up and tried to walk away but fell and broke his hip. He died three weeks later as a result of the fracture.

In March 2012, Eugene's widow, Bonnie (for herself and as Eugene's successor-in-interest), and his son, Scott,[1] commenced this action against Cypress Operations, alleging numerous causes of action arising from Eugene's stay at Cypress and his resulting death. Following a demurrer by Cypress Operations, the Nidivers filed a first amended complaint that (among other things) added Lifehouse as a defendant.

In November 2013, a judgment for $400,000 was entered against Cypress Operations by stipulation after Cypress Operations accepted a Code of Civil Procedure section 998 offer from the Nidivers in that amount. The Nidivers acknowledged the satisfaction of that judgment in May 2014.

Also in May 2014, the trial court granted the Nidivers leave to amend their complaint to allege that Cypress Operations was the "alter ego" of its parent company, Lifehouse. As a result, the Nidivers filed a second amended complaint. In response, Lifehouse filed a motion for judgment on the pleadings. At the hearing on that motion, the Nidivers requested leave to further amend the complaint, which the court granted.

---

[1] We will refer to Bonnie and Scott Nidiver jointly as the Nidivers.

2

The third amended complaint followed. That complaint alleges four causes of action: (1) elder abuse -- willful or reckless misconduct; (2) elder abuse -- neglect committed with fraud; (3) elder abuse -- custodial neglect; and (4) wrongful death (elder abuse). The first three causes of action were brought by Bonnie as Eugene's successor in interest; the fourth cause of action was brought personally by Bonnie and Scott as Eugene's heirs. house demurred to the third amended complaint, arguing that: (1) the Nidivers failed to state facts sufficient to constitute a claim for elder abuse against Lifehouse; (2) the law does not recognize a cause of action for wrongful death by a decedent's heirs based on the California Revised Uniform Limited Liability Company Act (Corp. Code, § 17701.01 et. seq.) (the Act); (3) Lifehouse could not be liable under an alter ego theory; and (4) Lifehouse could not be liable under an agency theory. Lifehouse also filed a motion to strike various parts of the third amended complaint.

In September 2014, the court sustained Lifehouse's demurrer on all grounds asserted by Lifehouse without leave to amend and ordered the motion to strike off calendar as moot. From the resulting judgment of dismissal, the Nidivers timely appealed.

DISCUSSION

I

*Standard Of Review*

"On appeal from a judgment dismissing an action after sustaining a demurrer without leave to amend, the standard of review is well settled. The reviewing court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded. [Citations.] The court does not, however, assume the truth of contentions, deductions or conclusions of law. [Citation.] The judgment must be affirmed 'if any one of the several grounds of demurrer is well taken. [Citations.]' [Citation.] However, it is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory. [Citation.] And it is an

3

abuse of discretion to sustain a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment." (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966-967.) "[T]he burden is on the plaintiff to demonstrate that the trial court abused its discretion. [Citations.] Plaintiff must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading." (*Cooper v. Leslie Salt Co.* (1969) 70 Cal.2d 627, 636.)

## II

### *Alter Ego Liability*

On appeal, the Nidivers contend Lifehouse can be held liable under an alter ego theory because the facts alleged in the complaint establish that "failure to disregard [Cypress Operations'] corporate entity and treat its corporate actions as those of [Lifehouse] would sanction fraud or promote an injustice." We disagree.

Under the Act, a member of a limited liability company is subject to liability under the common law governing alter ego liability. (Corp. Code, § 17703.04, subd. (b).) "The alter ego doctrine arises when a plaintiff comes into court claiming that an opposing party is using the corporate form unjustly and in derogation of the plaintiff's interests. [Citation.] In certain circumstances the court will disregard the corporate entity and will hold the individual shareholders liable for the actions of the corporation: 'As the separate personality of the corporation is a statutory privilege, it must be used for legitimate business purposes and must not be perverted. When it is abused it will be disregarded and the corporation looked at as a collection or association of individuals, so that the corporation will be liable for acts of the stockholders or the stockholders liable for acts done in the name of the corporation.' [Citation.] [¶] There is no litmus test to determine when the corporate veil will be pierced; rather the result will depend on the circumstances of each particular case. There are, nevertheless, two general requirements: '(1) that there be such unity of interest and ownership that the separate personalities of the corporation

4

and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow.' [Citation.] And 'only a difference in wording is used in stating the same concept where the entity sought to be held liable is another corporation instead of an individual.' " (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 300.)

In the trial court, Lifehouse contended it could not be held liable for the actions of Cypress Operations under an alter ego theory of liability because plaintiffs failed to allege sufficient facts to show that an inequitable result would occur if the alter ego theory were not applied. On appeal, the Nidivers contend they have "alleged facts showing injustice or an inequitable result will follow if the alter ego doctrine is not applied" because they have alleged that (1) Lifehouse "manipulates assets and liabilities so as to concentrate assets in [Lifehouse], while concentrating liabilities in" Cypress Operations; (2) Lifehouse "uses [Cypress Operations] as a 'mere shell, instrument or conduit' for [Lifehouse] to generate management fees and profits"; (3) Lifehouse "does not allow [Cypress Operations] to realize any profits at the facility level" (4) Lifehouse "commingles funds and other assets generated by its skilled nursing facilities, including Cypress, and prioritizes payment of its own management fees over all other costs, and siphons funds in the form of management fees and profits, as the sole member of" Cypress Operations; and (5) the Nidivers themselves "would be deprived of full recovery for their injuries, despite [Lifehouse's] use of [Cypress Operations] as a mere shell or conduit" if the corporate veil between the two companies is not pierced.

The flaw in the Nidivers' argument is that they have not alleged any connection between the first four factors on which they rely -- which, taken together, allege how Lifehouse manipulates the finances of Cypress Operations to Lifehouse's benefit -- and the fifth factor -- which alleges the injustice that will result from refusing to pierce the veil: denial of full recovery. In other words, the Nidivers have not alleged, nor does it appear that they *can* allege, that they will be deprived of full recovery for their injuries if

5

the veil is not pierced *because* Lifehouse manipulates the finances of Cypress Operations to Lifehouse's benefit in the specific ways the Nidivers have identified.

"The alter ego doctrine does not guard every unsatisfied creditor of a corporation but instead affords protection where some conduct amounting to bad faith makes it inequitable for the corporate owner to hide behind the corporate form." (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 539 (*Sonora Diamond*).) Here, the bad faith conduct the Nidivers have alleged on the part of Lifehouse -- financial manipulations of Cypress Operations to Lifehouse's benefit -- is not the cause of any inequity that may exist if the $400,000 settlement with Cypress Operations is not enough to make the Nidivers whole. If the Nidivers could have alleged that they recovered only $400,000 from Cypress Operations, despite having suffered damages valued at more than that amount, *because* Lifehouse engages in the financial manipulations specified in the complaint, then it would be an issue of fact as to whether Lifehouse was using the limited liability company form unjustly and in derogation of the Nidivers' interests and as to whether an inequitable result would follow from the refusal to pierce the veil between the two companies. But on the facts here, if the Nidivers' recovery of $400,000 from Cypress Operations is insufficient to fully compensate them for their injuries, that insufficiency cannot be blamed on Lifehouse's financial manipulations; instead, it can only be blamed on the fact that *$400,000 was the amount the Nidivers chose to offer to settle for in their section 998 offer to Cypress Operations*. Thus, if the Nidivers are being denied a full recovery for their injuries, it is not because of any financial manipulations by Lifehouse, but because the Nidivers themselves agreed to settle with Cypress Operations for less than the full amount they believed they were due.

Presumably the Nidivers chose to settle for $400,000 in order to avoid the risk that they might obtain less, or nothing at all, from Cypress Operations if they moved forward with the litigation of the case. Indeed, they allege in the complaint that they made the section 998 offer "in order to assure at least a partial recovery." But having made the

6

choice to recover $400,000 by settlement with Cypress Operations, the Nidivers cannot collect the very amount of money they said they wanted, then turn around and blame the insufficiency of their recovery on Lifehouse's financial manipulations -- at least, not without any allegation that the amount they sought in settlement was somehow limited by the financial manipulations of Lifehouse. For example, if the Nidivers could have alleged that they offered to settle with Cypress Operations for only $400,000 because they reasonably determined that Cypress Operations would not and could not accept a higher offer due to the fact that its resources were limited by Lifehouse's financial manipulations, then perhaps there would have been a basis to find that an inequitable result would follow from refusing to pierce the veil. The Nidivers offered no such allegation, however, nor do they suggest that they could have truthfully done so.[2]

Furthermore, the Nidivers cannot claim that Lifehouse is using the limited liability company form unjustly, to the Nidivers' detriment, based on the allegation that Lifehouse was "fully aware" the Nidivers did not intend their section 998 offer "to compensate [them] for all damages sustained" but "nonetheless allowed" Cypress Operations to accept that offer. The Nidivers are the ones who put the $400,000 figure on the table; they cannot claim injustice just because Cypress Operations accepted it. Moreover, contrary to the Nidivers' suggestion, Lifehouse owed them no duty to "insist upon a resolution including both defendants," when it was the Nidivers who chose to extend the section 998 offer to Cypress Operations alone.

On the allegations here, any insufficiency in the $400,000 settlement cannot be blamed on Lifehouse or its alleged financial manipulations with respect to Cypress Operations. The Nidivers received exactly what they asked for. Just because they

---

[2]     Lifehouse has claimed that the Nidivers knew Cypress Operations had the financial resources (specifically, insurance) to cover a larger settlement, and the Nidivers have never controverted that claim.

7

believe their damages were worth more is not a sufficient reason to pierce the veil between Cypress Operations and Lifehouse.  Accordingly, the trial court did not err in concluding that the Nidivers failed to state sufficient facts to establish liability on the part of Lifehouse under the alter ego doctrine.

### III

#### *Agency Liability*

The Nidivers next contend Lifehouse can be held liable based on an agency theory pursuant to the reasoning of *Sonora Diamond*.  Again, we disagree.

*Sonora Diamond* involved (among other things) the question of whether the California courts had jurisdiction over an out-of-state parent corporation (Sonora Diamond) because of the degree of control that corporation exercised over its subsidiary (Sonora Mining), which operated a gold mine within the state.  (*Sonora Diamond*, *supra*, 83 Cal.App.4th at pp. 530-534, 540-552.)  The appellate court explained that "[a]gency may confer general jurisdiction in the forum state over a foreign corporation," but "neither ownership nor control of a subsidiary corporation by a foreign parent corporation, without more, subjects the parent to the jurisdiction of the state where the subsidiary does business."  (*Id.* at p. 540.)  The court went on to explain as follows:

" 'Control' in this context means the degree of direction and oversight normal and expected from the status of ownership; it comprehends such common characteristics as interlocking directors and officers, consolidated reporting, and shared professional services.  [Citations.]  The relationship of owner to owned contemplates a close financial connection between parent and subsidiary and a certain degree of direction and management exercised by the former over the latter.  [Citations.]

"However, the case law identifies one situation when the acts of the parent may be found to trespass the boundaries of legitimate ownership and control of the subsidiary and expose the parent to the power of the state in which the subsidiary does business.  Thus, where the nature and extent of the control exercised over the subsidiary by the

parent is so pervasive and continual that the subsidiary may be considered nothing more than an agent or instrumentality of the parent, notwithstanding the maintenance of separate corporate formalities, jurisdiction over the parent may be grounded in the acts of the subsidiary/agent. [Citation.] In this instance, the question is not whether there exists justification to disregard the subsidiary's corporate identity, the point of the alter ego analysis, but instead whether the degree of control exerted over the subsidiary by the parent is enough to reasonably deem the subsidiary an agent of the parent under traditional agency principles. [Citation.] The jurisdiction acquired by the forum state under this rationale is general. [Citation.]

"Control is the key characteristic of the agent/principal relationship. [Citation.] Accordingly, if a parent corporation exercises such a degree of control over its subsidiary corporation that the subsidiary can legitimately be described as only a means through which the parent acts, or nothing more than an incorporated department of the parent, the subsidiary will be deemed to be the agent of the parent in the forum state and jurisdiction will extend to the parent. [Citations.]

"The nature of the control exercised by the parent over the subsidiary necessary to put the subsidiary in an agency relationship with the parent must be over and above that to be expected as an incident of the parent's ownership of the subsidiary and must reflect the parent's purposeful disregard of the subsidiary's independent corporate existence. [Citation.] The parent's general executive control over the subsidiary is not enough; rather there must be a strong showing beyond simply facts evidencing 'the broad oversight typically indicated by [the] common ownership and common directorship' present in a normal parent-subsidiary relationship. [Citations.] As a practical matter, the parent must be shown to have moved beyond the establishment of general policy and direction for the subsidiary and in effect taken over performance of the subsidiary's *day-to-day* operations in carrying out that policy." (*Sonora Diamond*, *supra*, 83 Cal.App.4th at pp. 540-542, fn. omitted.)

9

Here, the Nidivers contend they have alleged "specific facts establishing agency liability":  namely, that Lifehouse "controlled all policies affecting [Cypress Operations'] activities as Cypress's licensee" and that "[h]igh-level employees of [Lifehouse] controlled the day-to-day operations of [Cypress Operations] and Cypress" "by formulating and developing corporate policies, and by making employment and budgetary decisions for [Cypress Operations] and Cypress."  According to the Nidivers, "[t]hat type of decision-making authority exceeds what would be the normal type of interactions officers and directors of a parent corporation would have with a subsidiary that manages its own daily operations," and therefore Cypress Operations should be treated as the mere agent of Lifehouse for purposes of establishing the principal's (i.e., Lifehouse's) liability for the agent's (i.e., Cypress Operations') actions.

The Nidivers' argument might have carried the day if Cypress Operations were, in fact, a corporation, but it is not; it is a limited liability company, and that makes all the difference.  Essentially, *Sonora Diamond* rests on the principle that agency is established when the parent corporation "trespass[es] the boundaries of legitimate ownership and control of the subsidiary" corporation and, despite observing corporate formalities, "in effect take[s] over performance of the subsidiary's *day-to-day* operations."  (*Sonora Diamond*, *supra*, 83 Cal.App.4th at pp. 541, 542.)  In the context of a limited liability company like Cypress Operations, however, a member-manager like Lifehouse does not trespass the boundaries of legitimate ownership and control by taking over performance of the company's day-to-day operations.  The governing law provides that "[u]nless the articles of organization indicate the limited liability company is a manager-managed limited liability company, every member is an agent of the limited liability company for the purpose of its business or affairs, and the act of any member, including, but not limited to, the execution in the name of the limited liability company of any instrument, for the apparent purpose of carrying on in the usual way the business or affairs of

10

the limited liability company of which that person is a member, binds the limited liability company in the particular matter, unless the member so acting has, in fact, no authority to act for the limited liability company in the particular matter and the person with whom the member is dealing has actual knowledge of the fact that the member has no such authority." (Corp. Code, § 17703.01, subd. (a).) Thus, it is entirely appropriate under the Act for a member-manager like Lifehouse to manage the day-to-day operations of the company, and in doing so the member-manager does not make the company its agent; instead, the Act expressly provides that the member-manager is the agent and the company the principal, and not the other way around. If we were to accept the Nidivers' argument that agency liability could be imposed on Lifehouse under the reasoning of *Sonora Diamond*, we would turn the statutory scheme for limited liability companies on its head, which we are not entitled to do. Accordingly, the trial court did not err in concluding that the Nidivers failed to state sufficient facts to establish liability on the part of Lifehouse under the agency principles of *Sonora Diamond*.

IV

*Direct Liability*

Finally, the Nidivers contend their third amended complaint alleges facts supporting the direct liability of Lifehouse as a perpetrator of elder abuse. They contend that because (according to the allegations of their complaint) Lifehouse "exercised complete control over the activities of Cypress," "determined whether to hire or fire Cypress's employees," and "had authority to implement or refuse measures impacting the safety of Cypress residents," Lifehouse was a "care custodian" under the elder abuse statutes "as an entity providing care to [Eugene] and one whose employees were in a position to exert undue influence over [Eugene]." The Nidivers further contend that the foregoing facts give rise to liability not only under the elder abuse statutes but also under "general tort law principles" because "[t]hose who act in concert, or who order, direct or permit others to act are liable as joint tortfeasors" and "a parent corporation is directly

11

liable for its own wrongful conduct in directing, authorizing, or participating in tortious conduct committed by its subsidiary."

The flaw in these arguments is that the Nidivers' complaint does not allege that Lifehouse did anything other than what it was lawfully entitled to do as the member-manager of Cypress Operations.  This is significant because, under the Act, the "debts, obligations or other liabilities of a limited liability company, whether arising in contract, tort, or otherwise" "are solely the debts, obligations, or other liabilities of the limited liability company to which the debts, obligations, or other liabilities relate," and "[t]hey do not become the debts, obligations, or other liabilities of a member or manager solely by reason of the member acting as a member or manager acting as a manager for the limited liability company."  (Corp. Code, § 17703.04, subds. (a)(1) & (2).)  As we have noted already, it is entirely appropriate under the Act for a member-manager like Lifehouse to manage the day-to-day operations of its limited liability company, and just as in doing so the member-manager does not make the company its agent, in doing so the member-manager does not become directly liable for the debts, obligations, or other liabilities of the company that arise from the company's operations.  The member-manager must act *outside* its statutorily authorized powers as a member-manager to incur direct liability for the debts, obligations, or other liabilities of the company, and here the Nidivers have not alleged any such actions by Lifehouse, nor claimed that they could do so.

Because the Nidivers have failed to show that their complaint alleges any lawful basis for holding Lifehouse liable here, either directly, or as the principal of Cypress Operations, or under alter ego principles, and because the Nidivers have not shown that they could amend their complaint further to cure this defect, we conclude the trial court did not err in sustaining Lifehouse's demurrer without leave to amend.

12

DISPOSITION

The judgment is affirmed.  Lifehouse shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(2).)

/s/
Robie, J.

We concur:

/s/
Blease, Acting P. J.

/s/
Hull, J.

13